[No. 43162.    En Banc.    December 12, 1974.]

BOISE CASCADE CORPORATION, *Appellant,* v. PIERCE COUNTY, *Respondent.*

Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson, by *E. M. Murray, James A. Furber,* and *William E. Holt,* for appellant.

*Ronald L. Hendry, Prosecuting Attorney,* and *Michael B. Hansen, Deputy,* for respondent.

HUNTER, J.—This case involves an action brought by the plaintiff (appellant), Boise Cascade Corporation (hereinafter referred to as "Boise"), against the defendant (respondent), Pierce County, in the Superior Court for Pierce County, to review a decision by the Washington State Board of Tax Appeals pursuant to RCW 82.03.180, and as a suit for refund of taxes paid to the defendant pursuant to RCW 84.68.020. The trial court awarded a judgment for the plaintiff against the defendant for taxes unlawfully and illegally assessed, and both parties thereafter filed a notice of appeal. The issues involved in the case center around the proper valuation of certain personal property owned by the plaintiff at its West Tacoma Newsprint plant, Steilacoom, Washington, during the assessment years of 1970 and 1971, for taxes payable in 1971 and 1972.

On January 1, 1970, and January 1, 1971, the plaintiff was the owner of certain personal property located at its West Tacoma Newsprint division in Steilacoom, Pierce County, Washington. Although the property in question is classified as personal property for tax purposes, it is, for the most part, large industrial machinery and equipment that is not readily or economically movable from its location. In evaluating the capabilities of its newsprint manufacturing facility at Steilacoom at this time, the plaintiff recognized that there were certain functional problems and deficiencies in the operation of the plant. The property tax manager employed by the plaintiff felt that the standard affidavit and listing form submitted to the county assessor pursuant to RCW 84.40.040 would overvalue the true and fair value of its machinery and equipment account, and therefore an appraisal of the personal property in the plant should be undertaken. Consequently, the plaintiff thereafter hired General Appraisal Company to prepare a so-called "nuts and bolts" appraisal, *i.e.*, reproduction costs

less depreciation, both physical and functional. This comprehensive appraisal indicated a true value of the personal property as follows:

| | |
|---|---:|
| Machinery and equipment | $7,030,900 |
| Transportation equipment | 272,710 |
| Spare machinery | 582,000 |
| Office equipment | 41,600 |
| | $7,927,210 |
| | rounded to $7,930,000 |

This appraisal was later submitted to the Pierce County assessor in the latter part of May 1970 when the plaintiff requested a reappraisal of the value of certain of its personal property. At this time the county assessor requested the special assistance of the Washington State Department of Revenue pursuant to RCW 84.41.060, to evaluate the appraisal undertaken by General Appraisal Company.

On June 23, 1970, Mr. Leslie D. Anderson, Supervisor of Appraisals for the Department of Revenue, wrote a letter to the Pierce County assessor commenting upon the appraisal and making certain suggestions. The letter accepted a part of General Appraisal Company's appraisal, which established the reproduction cost, less depreciation, and system functional obsolescence, but refused to accept $6,270,980 in overall plant functional obsolescence determined by General Appraisal Company. The letter, therefore, refused to accept the ultimate opinion by General Appraisal Company of the fair market value of the personal property of $7,930,000. On June 25, 1970, the Pierce County assessor, based solely upon the June 23 letter of the Department of Revenue, assessed the value of the personal property of the plaintiff as of January 1, 1970, at an alleged true value of $14,198,190, of which $13,301,880 was assigned to the machinery and equipment account.

Following the assessment of the plaintiff's personal property by the county assessor, the plaintiff filed a complaint with the Pierce County Board of Equalization protesting the county assessor's determination of value of the machin-

ery and equipment classification, and alleging the personal property in question to have a true value of $7,930,000 as of January 1, 1970. After a hearing, the Board of Equalization sustained the determination of value as found by the county assessor. On March 10, 1971, the plaintiff petitioned the Board of Tax Appeals of the State of Washington for review of the decision by the Pierce County Board of Equalization, and requested an *informal hearing* pursuant to RCW 82.03.140. During this time period the Pierce County treasurer issued a personal property tax statement for taxes due based upon the assessment by the county assessor, and on May 21, 1971, the plaintiff paid to the defendant under written protest the sum of $104,965.16 representing the first half of 1971 personal property taxes based upon the assessment by the Pierce County assessor. Meanwhile, on August 27, 1971, the Board of Tax Appeals of the State of Washington rendered a decision sustaining the determination of the Board of Equalization and the Pierce County assessor.

On October 6, 1971, the plaintiff sought a "de novo" review of the decision by the Board of Tax Appeals of the State of Washington in the Superior Court for Pierce County pursuant to RCW 82.03.180, and instituted an action for refund of taxes pursuant to RCW 84.68.020. On October 29, 1971, the plaintiff paid to the defendant under written protest the sum of $104,965.16 representing the second half of 1971 personal property taxes based upon the assessed value as determined by the county assessor, and the plaintiff's appeal and complaint for refund of taxes was accordingly amended on November 1, 1971. In accordance with the Department of Revenue's letter of June 23, 1970, the Pierce County assessor continued the determination (with some additions) that the true and fair value of the plaintiff's personal property was $15,189,060 as of January 1, 1971, whereas the plaintiff claimed that the true and fair value of the property in question as of January 1, 1971, was $8,619,531. Consequently, on April 28, 1972, the plaintiff

paid the defendant under written protest the sum of $111,943.37 representing the first half of the 1972 personal property taxes, and the plaintiff's appeal and complaint for refund of taxes was thereafter amended on May 9, 1972.

The trial of the case commenced on June 5, 1972, in the Superior Court for Pierce County, where expert testimony and the arguments of counsel were heard before the judge without a jury. The trial of the case continued until June 14, 1972, and thereafter, on October 10, 1972, and October 16, 1972, the trial court rendered an oral decision in the case, and entered findings of fact and conclusions of law on December 27, 1972. The court found that the assessments made by the county assessor for the assessment dates, January 1, 1970, and January 1, 1971, were arbitrary and capricious and constituted constructive fraud upon the plaintiff. The court reasoned that the county assessor had failed to make a determination of the true and fair value of the plaintiff's personal property as required by law since the assessment was based solely upon the June 23 letter from the Department of Revenue. The court held that not only was the valuation of the plaintiff's personal property based upon a fundamentally wrong premise in that the county assessor failed to fully recognize overall functional obsolescence which existed in the plant, but that the value placed upon the plaintiff's property was grossly inequitable and palpably excessive. Furthermore, the court found that the appraisal technique employed by General Appraisal Company was improper and failed to apply the correct test to determine the fair market value of the plaintiff's property. The trial court accordingly established that the true and fair value of the plaintiff's property (exclusive of inventory) on January 1, 1970, was $11,198,190, and entered judgment for the plaintiff in the sum of $42,029.45, together with interest in the sum of $3,514.23 and costs in accordance with law. In addition, the trial court held that the true and fair value of the plaintiff's personal property on January 1, 1971 (exclusive of inventory) was $11,310,107, and determined that the balance of taxes owing by the plaintiff

for 1972, after allowing for credit for taxes paid, amounted to $67,058.28. Neither party was satisfied. The plaintiff thereafter appealed that portion of the judgment which denied Boise the full relief prayed for in the amended complaint, and the defendant filed a notice of cross-appeal, appealing the judgment awarded to the plaintiff.

The major contention by the plaintiff in this case is that the county assessor acted improperly in failing to make an allowance for overall plant functional obsolescence in arriving at the true and fair value of the plaintiff's property. The record clearly shows that overall plant functional obsolescence should have been allowed as an item of depreciation.

This plant, prior to its acquisition by the plaintiff in 1969, was operated by a group of newspaper publishers for the production of newsprint for their own use and not for profit. The plaintiff's use of the plant for profit necessarily required a more efficient operation. Therefore, a Mr. Sandwell, an expert in plant analysis, was employed by the plaintiff to make a survey of the plant for repair and modernization. This report clearly disclosed that certain parts of the plant could not be effectively modernized which affected its total production capacity reflecting an overall plant obsolescence.

■■ Under the circumstances of this case, the trial court was correct in holding that the failure of the assessor to make an allowance for overall plant functional obsolescence, in consideration of the element of depreciation of the plant's true market value, resulted in an excessive and exorbitant valuation and amounted to constructive fraud upon the plaintiff. It is established law in this state that courts will grant relief from a grossly inequitable and palpably excessive overvaluation of property for taxation as constructively fraudulent, even though the assessing officers may have proceeded in good faith. *Pier 67, Inc. v. King County*, 71 Wn.2d 92, 426 P.2d 610 (1967); *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P.2d 301 (1937).

In the instant case, we conclude that the trial court was justified in entering a finding that the county assessor had failed to perform his duty in a proper manner, and in making a determination of the true and fair value of the plaintiff's property on the basis of the evidence that was before it. The record shows the trial court very carefully considered all the evidence by the respective experts of both parties, and in making its determination of the amount of overall plant functional obsolescence that should be allowed as a deduction to reflect the correct depreciation in arriving at the plant's true and fair value. That the trial court did just this on the evidence before it is disclosed by its oral opinion:

THE COURT: . . .

. . .

I have spent a great deal of time in examining the Sandwell Report and the appraisal by General Appraisal and have also read Mr. Anderson's testimony again which was transcribed, I think, for the use of both parties, and I have gone over both my own notes and I'm satisfied that the county assessor through the State Department of Revenue took the position that they would not allow for the total improvements that were allowed by General Appraisal in its evaluation of the fair market value of this particular property. I have gone back over Mr. Anderson's testimony and his position as I understand it, which is the position of the county at least as I also understand it, was, while Mr. Anderson acknowledged that there was functional obsolescence of one kind or another, that he disagreed with the amount and the reasons for the deduction by General Appraisal.

It's my conclusion that he is correct. My recollection of Mr. Anderson as a witness—my recollection is, and I've gone back over his testimony and I examined him on this area again, and his position was and his demeanor on the stand was certainly such to cause me to conclude that he had not made—and of course he admitted this—an initial appraisal of the plant. He was not asked to do this by Mr. Roberts on behalf of the county assessor, so he had not done so. They had made an appraisal thereafter and it's my own conclusion that that appraisal was to buttress up,

actually, what they had concluded in their letter to Mr. Roberts.

Mr. Anderson, if you will recall, very readily admitted that he had gotten his department out on a limb, and it would not happen in the future, and therefore he was not proud of what happened. And as I say, my analysis of his demeanor on the stand was such that he felt if he had been given more time, if he had been asked to make an appraisal he would have done so and probably would have come up with some other evaluation than the thirteen plus million that he included in his letter to Mr. Roberts.

The test of course in this area is what a willing seller would take, not forced to sell, and a willing buyer take, not forced to buy. It's my conclusion that the opinion as given by the witness for Boise Cascade failed, really, to abide by this test. I say that for this reason: As I say, I've gone over the appraisal in depth of General Appraisal. I've also gone over the entire Sandwell Report. The entire Sandwell Report resulted from a request by Boise Cascade for a study to bring the production capacity of that mill up to a certain level which was higher of course than that originally produced by this mill when it was bought. This study was made. Practically everything in that report has to do with new and improved facilities. General Appraisal in their opinion felt that this entire amount had to be utilized as a depreciation of the physically depreciated assets of this plant to arrive at a market value. They attributed this to functional obsolescence. I am not going to go through all the various phases and factors included in the phrase "functional obsolescence" but that does include over-adequacy, inadequacy, inefficiency and out-of-date equipment. But, in the final analysis all functional obsolescence is a decrease in a known value of machinery or plant equipment or an operating plant as it was here.

It's my conclusion that General Appraisal did this from the standpoint of a willing buyer, not a willing seller. I say that because in the various allocations for functional obsolescence that they made throughout the report it was my conclusion that they—those allowances for functional obsolescence just could not be reconciled by the test as I've indicated.

For example, in the new wood preparation they depreciated the value of that plant 30 percent because of overdesign. In other words, they took $184,400 away from that plant for that. The chemical pulp facility they had which had a depreciated value of $140,800 as I recall, they reduced that some 67 percent down to—I don't have the figure here, but another smaller figure. The water supply system was depreciated 40 percent which I thought was excessive.

I realize Mr. Buck testified that at the time, and this is in 1972—we're going back a few years please remember —that they had been apparently told by the Department of Ecology that the effluent that this mill was discharging into Chambers Creek at the tide water level was going to be restricted, but there were no restrictions at the time. He talked always in the future.

I went back and listened to the tape on this to make certain my notes were right. It appeared to me that when this evaluation was made in '70 and '71 that an excess of water was actually an improved position insofar as the seller is concerned because in pulp you have to have water. The buyer of course of this plant, as the testimony here indicated, would have in mind the increase of production and would therefore need additional water in that respect. And certainly as far as the seller is concerned in this area I do not believe a willing seller would depreciate his water supply 40 percent which is almost half.

The Sandwell Report amazingly recommended that Boise Cascade retain the equipment they had and build up from that which indicated, at least to me, that they felt this equipment that Boise Cascade had purchased was certainly of value in the long run.

Now, there's another area in which—I am looking for it in my notes here—in which General Appraisal felt there was a depreciated value on one of the items—I can't remember what it was now—and they said, "Well, there was about two years left," and so they gave this nearly salvage value and the salvage value as I recall was a figure of $50,000. I, again, just couldn't in my own mind feel that a willing seller would depreciate that piece of equipment—yes, here it is here. Number three, old wood preparation plant; they deducted $118,100 from $231,000 and said although it would be used and it was

anticipated to be used for two years it would be retired, and so they gave it a salvage value of $50,000. Now, honestly, gentlemen, I can't imagine any willing seller selling somebody a piece of equipment which they said was salvage at $50,000 and not asking more than that when it was going to be used for two years. This is just a few indications of why I felt General Appraisal had the buyer in mind rather than the willing seller, so that the test that is required to be met by the statutes in this state wasn't met. I feel their determination that the full Sandwell Report should be utilized as a deduction was in error. Now, I say that because they did, in effect, use the entire Sandwell Engineering Report. They subtracted from the Sandwell estimated expenditures the amount of functional obsolescence that they had determined was deductible from the depreciated value of all the equipment. Therefore, they as I say deducted that from the Sandwell recommendations and from that they came to a figure of some $6,000,000 I believe and felt that that had again—had to be taken from the depreciated value of the equipment in order to arrive at a final figure of the fair market value of the machinery and equipment, and that's all we're talking about here, really.

█ █ █ We have quoted at length from the trial court's oral opinion to demonstrate that the amount of overall plant functional obsolescence to be allowed was purely a factual determination made by the trial court upon the evidence before it, applying the familiar test of what a purchaser willing, but not obliged, to buy would pay to an owner willing, but not obligated, to sell, taking into consideration all uses to which the property is adapted and might in reason be applied. Under these circumstances, this court cannot substitute its judgment for that of the trial court. *Mayo v. Mayo*, 75 Wn.2d 36, 448 P.2d 926 (1968); *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

It is argued by the plaintiff, however, that the trial court's determination was not based upon the evidence in the record in that the county introduced no expert testimony supporting its valuation of the plaintiff's property.

We need only refer to the above quoted part of the trial court's oral opinion to demonstrate that the plaintiff is in error. In this regard, the trial court further stated:

> I went over this thing in detail myself—the chief issue raised by the plaintiff here is whether or not I stayed within the evidence. I think I did.

█ It is further argued that the trial court erred in failing to consider any evidence on the income approach in arriving at the true and fair value of the plaintiff's property. We disagree. The record shows that witnesses on both sides testified in regard to the income approach which the trial court considered, but to which it gave no credence by reason of the short period in which the plant had been in operation, and that the history of the income was too brief to be reliable. The trial court stated:

> Since this was a case of expert testimony on both sides, and my recollection was that the income approach, both appraisers admitted for the years we were talking about here, income was worthless. It was used at a time when they figured they had to have it just to plain have the appraisal on that basis, but they both agreed for the years we're talking about that the income approach had no real validity because there wasn't enough—it wasn't a profit-making enterprise at the time it was sold to Boise Cascade, or merged into Boise Cascade.

It is further argued that the income approach was not considered by the defendant's expert witness. This is in error. We quote further from the trial court's oral opinion:

> You'll recall in Mr. Anderson's testimony that he acknowledged that the buyer of the plant was going to have to spend some money and that he would not be able to get it all back; meaning, it couldn't be deducted from the cost of this particular assessment. But, he did acknowledge there was a functional obsolescence and he called it "incentive" and my recollection is in the testimony of the various appraisers that there was an element that they considered which they called, I think, income incentive. I can't quite remember, but that particular factor was used by the appraisers to give some weight to the position that a seller would take in looking at a plant

to see whether or not he could make money. And Mr. Anderson acknowledged that this plant was not and had not been a profit making venture and was not designed to do so. It's my inference or conclusion from his testimony that he felt there was some allowance that should be made in this case for income incentive; meaning, that a buyer would have to make some allowance for improving what was there in order to make it a profit-making enterprise. The seller, accordingly, would have to take some discount from what he felt the plant was worth based on the fact they had not created a profit-minded enterprise at the outset.

It is contended by the defendant in support of its cross-appeal that the reasons stated for the payment of the taxes under protest by the plaintiff were insufficient to support a claim for refund under RCW 84.68.020. We find no merit to this contention. There can be little doubt that the county had sufficient notice to understand the basis upon which the protest was made.

In summary, we find this case to be a factual appeal; that the determination by the trial judge of the true value of the plaintiff's property was well within the ambit of the evidence; that the trial court did consider the income approach but found the evidence thereon to be of no assistance in determining the true and fair value of the plaintiff's property for the respective tax assessment years of 1970 and 1971.

We have reviewed the other assignments of error raised by the parties and find them to be without merit or implicitly considered in view of our disposition of the case.

The judgment of the trial court is affirmed.

FINLEY, ROSELLINI, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.

HALE, C.J. (concurring in the result)—I concur in the result of the opinion. The trial court should be affirmed on the principle that this court will not substitute its view of the facts for those of the trial court when supported by

substantial evidence. Here, on substantial but conflicting evidence, the trial court found that the assessor had fixed too high a value upon the subject property.

Beyond that, I would not go. The case presents no more than the review of a factual dispute resolved by the superior court on disputed evidence based largely on conflicting conclusions of expert witnesses. The learned trial judge in resolving these disputes of fact did not, I am sure, intend to abridge nor impair the responsibilities of and great weight to be accorded the county assessor, the county boards of equalization, and finally the state's tax agencies in fixing value for tax purposes.

The hazard here, however, is that in referring to what is called functional obsolescence, the court in its opinion, may be adding a new element to the taxing methodology and require that it be specifically included and declared by the public officer charged by law with the responsibility of appraising property for purposes of assessing taxes. As I see it, the expression "functional obsolescence" is no more than one of numerous descriptive terms delineating one of many means employed by some experts in the field of real estate appraising who may take one of several available approaches in making an estimate of fair cash market value. To hold that the assessor must ascertain whether obsolescence exists and then put a figure on it, I fear would require the assessor to spend more money in assessing commercial and industrial property than the treasurer could collect in taxes from it.

In *State v. Wilson*, 6 Wn. App. 443, 447, 493 P.2d 1252 (1972), the Court of Appeals stated the three basic approaches currently employed by real estate appraisers in determining fair market value, and pointed out that if the cost-of-reproduction approach is utilized then a deduction should be made for depreciation. Depreciation, the court said, includes *economic* and functional obsolescence. That court, I think, was speaking conceptually and did not mean to declare a rule that the assessor, the board of equaliza-

tion, or the state taxing agency must, as this court now implies, put a figure in dollars and cents upon the cost of reproduction, or upon depreciation, or upon economic obsolescence, or upon functional obsolescence, or indeed even use the cost-of-reproduction approach.

Public officials charged by the law with determining value for tax purposes may use all or none of the approaches described in *State v. Wilson, supra,* or a mix of some or all of them. All of these imponderables and variables are included in and a part of the concept of depreciation. *See Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 167, 78 L. Ed. 1182, 54 S. Ct. 658 (1934) and *State ex rel. Pacific Tel. & Tel. Co. v. Department of Pub. Serv.,* 19 Wn.2d 200, 142 P.2d 498 (1943).

One should not overlook the fact that appraising property is more of an art than a science, that it necessarily deals in imponderables and may involve wide disputes in expert opinion or judgment. Even functional obsolescence is a vague and imprecise concept, and when related to the idea of economic obsolescence it becomes even more so. Thus, a buggy whip manufacturer employing the most modern and efficient machinery designable, while not deemed functionally obsolescent in most respects, quite likely would be held economically obsolescent in all respects, and to fix a fair value upon the machinery might require the assessor to reject the idea of obsolescence altogether.

I would, therefore, while concurring in the result of this opinion, read it to hold no more than that the evidence supports the judgment and that neither the assessor nor other taxing authorities are, under existing statutes and the constitution, required to designate in dollars and cents the amount ascribed to functional or economic obsolescence, or depreciation for that matter, in arriving at the fair market value.

UTTER, J., concurs with HALE, C.J.