[No. 25966-8-III.   Division Three.   February 14, 2008.]

WASHINGTON BEEF, INC., ET AL., *Appellants*, v. YAKIMA COUNTY, *Respondent*.

---

*Jacquelyn A. Beatty, Charles A. Robinson,* and *Walter E. Barton* (of *Karr, Tuttle, Campbell*), for appellants.

*Ronald S. Zirkle, Prosecuting Attorney,* and *John V. Staffan, Deputy,* for respondent.

¶1 SWEENEY, C.J. — Setting the value of assets for the purpose of assessing property taxes is more of an art than a science. And we review a trial judge's findings following a trial for substantial evidence. The evidence here included testimony on the proper approach to valuation. The trial judge heard conflicting expert testimony from the county and the taxpayer on the appropriate method of valuing property. All experts here purported to provide the appropriate analytical tools to calculate the value of a beef processing plant for the purpose of assessing county ad valorem taxes. The trial judge rejected approaches suggested by both sides and in a reasoned, calculated set of findings of fact and conclusions of law set the value of the plant and facilities. We conclude that the court's findings are supported by this record and that they support the court's conclusions of law, including the court's conclusion of the value of the plant. We therefore affirm the judgment.

## FACTS

### Washington Beef

¶2 Washington Beef Inc. is a beef slaughter, fabrication, and storage plant located in Toppenish, Yakima County, Washington. It is a Washington corporation formed in 1980. The plant was originally three separate facilities used to process beef for wholesale and retail sales in foreign and domestic markets. Central Foods Ltd. is a Japanese corporation. It bought Washington Beef Inc. in 1988. Over the next 14 years, it added $40 million in capital improvements. Central eventually consolidated the operations in one modern 205,000 square foot plant on 132 acres.

¶3 The Japanese economy slowed in the late 1990s. And Central was then less willing to provide necessary capital for Washington Beef Inc. The corporation's property was valued at $25 million in May 1998 by a private appraisal firm. Washington Beef Inc. faced increased competition from Canadian beef processing plants at that time. Earnings declined. Washington Beef Inc. management asked the owners for permission to seek new capital. The owners gave permission in 2002. And Washington Beef Inc. began to look for potential purchasers or investors.

¶4 AgriBeef Inc. is a beef processing firm incorporated in Idaho. It bought most of Washington Beef Inc.'s assets in April 2003. AgriBeef paid $10,250,000 in cash and assumed $22,000,000 in liabilities for a total purchase price of around $32,250,000. Washington Beef Inc. and AgriBeef allocated $4,749,000 of the total purchase price to the plant and land as part of their deal. AgriBeef formed Washington Beef LLC to operate the plant. We will refer to Washington Beef Inc. and Washington Beef LLC as "Washington Beef" unless reference to the original entity is appropriate.

### Yakima County and Assessed Values

¶5 Yakima County (County) is a municipal corporation in south central Washington. The County is on a two-year

tax cycle. So property taxes for a particular year are based on the value assessed on January 1 of the previous year. Yakima County's assessor is Dave Cook. He valued Washington Beef's land in 2001, 2002, and 2003 at $1,098,250. Washington Beef agrees with the assessed value of the land. Mr. Cook valued the buildings and equipment as of January 2001 at $34,717,200. Washington Beef disagrees. It values that property at $6,901,750. Mr. Cook valued buildings and equipment as of January 2002 at $31,350,400. Washington Beef disagrees and valued that property at $5,801,750. Finally, Mr. Cook valued that property as of January 2003 at $30,718,453. And Washington Beef valued the property at $3,650,750.

PAYMENT OF TAX

¶6 Washington Beef paid the 2002, 2003, and 2004 ad valorem taxes, based on the disputed values. It paid under written protest. Washington Beef then sued the County for a refund. Actually, between the two companies (Washington Beef Inc. and Washington Beef LLC) there were three separate suits for refund filed; all were consolidated for trial.

THE TRIAL

¶7 The case was tried to the court over the course of nine days. Both Washington Beef and the County offered expert testimony on proper methods of valuing Washington Beef's plant and facilities and the resultant value. Washington Beef's experts focused on the historical income generated by the facility and the values attributed to various assets when AgriBeef bought Washington Beef Inc. The County's experts emphasized the plant's potential "normalized cash flows," and downplayed the values ascribed to various assets of the plant when it was sold to AgriBeef. Clerk's Papers (CP) at 39. Each disagreed on the basic assumptions needed to value the plant *based on income* such as cash flows, capitalization rates, discount rates, and the like.

¶8 The trial judge concluded that the County had failed to factor in "economic obsolescence" that resulted from

increased competition and other business pressures external to the plant. CP at 33. But the judge also concluded that Washington Beef had overstated the effect of these external factors on the value of the plant and thereby understated the value of the facilities. The judge also found that the historical cash flows used to calculate the value of the facility understated its value. He then set the County's overvaluations at $5,717,200 in 2001, $4,750,400 in 2002, and $6,718,453 in 2003. The court entered appropriate findings of fact and conclusions of law and a judgment that required the County to refund a portion of the taxes along with interest. The court denied Washington Beef's motions to reconsider. Washington Beef petitioned the Washington Supreme Court for discretionary review. The Supreme Court transferred the matter to us.

## DISCUSSION

■ ¶9

All property shall be valued at one hundred percent of its true and fair value in money and assessed on the same basis unless specifically provided otherwise by law.

. . . .

The true and fair value of real property for taxation purposes . . . shall be based upon the following criteria:

(1) Any sales of the property being appraised or similar properties with respect to sales made within the past five years. . . .

(2) In addition to *sales* as defined in subsection (1) of this section, consideration may be given to cost, *cost less depreciation, reconstruction cost less depreciation*, or *capitalization of income* that would be derived from prudent use of the property. In the case of *property of a complex nature*, . . . or property not having a record of sale within five years and not having a significant number of sales of similar property in the general area, the provisions of this subsection shall be the dominant factors in valuation. When provisions of this subsection are relied upon for establishing values the property owner shall be

advised upon request of the factors used in arriving at such value.

Former RCW 84.40.030 (2001) (emphasis added). The property must be valued based on its highest and best use. WAC 458-07-030(3). "Highest and best use" is "the most profitable, likely use to which a property can be put. It is the use which will yield the highest return on the owner's investment." WAC 458-07-030(3).

## METHODS OF DETERMINING FAIR MARKET VALUE

¶10 The phrase "true and fair value in money" means "fair market value." *Cascade Court Ltd. P'ship v. Noble*, 105 Wn. App. 563, 567, 20 P.3d 997 (2001). And "market value" is what a willing buyer under no obligation to buy would pay a willing seller under no obligation to sell. *Crystal Chalets Ass'n v. Pierce County*, 93 Wn. App. 70, 77, 966 P.2d 424 (1998).

¶11 But arriving at a market value is difficult, particularly when the property is "of a complex nature" as it is here. There are three general approaches to arrive at market value: capitalization of income, cost, and market. *Id.* Appraisers generally use one or a combination of these three general approaches to arrive at fair market value. *Id.* The appraiser must then reconcile the values arrived at through these three methods and emphasize the "value generated by the method deemed to be the most reliable." *Id.* at 77-78.

### *Capitalization of Income*

¶12 Washington Beef based its valuations on the income approach. This method assumes value is approximately equal to the present value of the future benefits of property ownership. *Sahalee Country Club, Inc. v. Bd. of Tax Appeals*, 108 Wn.2d 26, 33, 735 P.2d 1320 (1987). An appropriate annual rate of capitalization is applied to a forecast of annual net income. *Id.* Unlike the cost approach, the income approach "explicitly considers the impact of eco-

nomic obsolescence by relying on the cash flow generated by the assets as of the valuation date, given the known economic and financial factors facing the Company." CP at 34 (Finding of Fact 35).

¶13 Income capitalization converts anticipated cash flows into present value by capitalizing (converting to an asset) net operating income or cash flow by a capitalization rate. *Sahalee*, 108 Wn.2d at 33. The idea is to place a *present value* on a *future stream* of income[1] because how much the plant is expected to generate in the future is an indicator of what it is worth now.

¶14 There are two essential variables to this approach. The first is the anticipated income stream or cash flow. The experts did not agree on the appropriate value of the cash flow here. The second factor is the capitalization rate: the rate to be divided into the income or cash flow to arrive at a present value of the facility (capitalized value). Here, the parties disputed the appropriate rate to be applied. The rate makes a big difference in the value because the higher the rate, the lower the value of the plant and vice versa, the lower the rate, the higher the value.

## Cost

¶15 The County assessed Washington Beef using the cost approach. This method of determining fair market value "estimates what it would cost a typically informed purchaser to produce a replica of the property in its present condition." *Sahalee*, 108 Wn.2d at 33.

¶16 The appraiser looks at the historical cost of the plant or the cost to replace those assets and deducts depreciation. The depreciation is a function of physical depreciation, or obsolescence. Obsolescence can be either functional or external. Functional obsolescence results from those characteristics unique to the plant itself, like the high unit cost of producing products at this plant. *Delta Air Lines, Inc. v. Dep't of Revenue*, 328 Or. 596, 605 n.5, 984 P.2d 836 (1999);

---

[1] *Crystal Chalets*, 93 Wn. App. at 77.

*State v. Red Wing Laundry & Dry Cleaning Co.*, 253 Minn. 570, 574, 93 N.W.2d 206 (1958); *see also* CP at 33. External or economic obsolescence refers to factors outside of the plant like a shrinking supply of cattle or increased competitive pressures from an industry gravitating more and more toward vertical integration. *Delta Air Lines*, 328 Or. at 605 n.5; *Red Wing*, 253 Minn. at 574; *see also* CP at 33. The parties here agreed on the cost of the land. But that is all they agreed on. Washington Beef argues that the County and the court failed to give enough weight to the economic obsolescence of this plant.

### *Market Value: Comparable Sales*

¶17 The comparable sales approach requires that an appraiser compare the sale prices of similar properties. *Sahalee*, 108 Wn.2d at 33. This method of valuation is the most reliable as long as the supporting data is adequate. *Id.* Indeed, former RCW 84.40.030(1) requires the appraiser to base valuation on any sales of the property being appraised or similar property sold within the past five years. *See also* WAC 458-07-015(2) (in determining market trends, the assessor must consider current sales data, meaning sales of real property that occurred within the past five years; the assessor may also consider sales that occur in the assessed year).

¶18 Market value, as the name implies, is based on the sales of other similar properties. The idea here is that informed buyers would not pay more for this property than what they could pay for other similar properties on the open market. The use of market value assumes an arm's length transaction. Here, Washington Beef argues that the court should have placed more weight on the values Washington Beef Inc. and AgriBeef placed on the plant and facilities when AgriBeef bought the assets. The County responds that it was hardly an arm's length transaction.

### Assessor's Value

¶19 An assessor's valuation of property for tax purposes is presumed correct. RCW 84.40.0301. This presump-

tion may be overcome, however, if the taxpayer presents clear, cogent, and convincing evidence that the property was overvalued. *Weyerhaeuser Co. v. Easter*, 126 Wn.2d 370, 380, 894 P.2d 1290 (1995). Once the taxpayer overcomes the presumption that an assessor's overall valuation technique is correct, the standard of proof shifts to a preponderance of the evidence for all issues. *Id.* at 381; *Welch Foods, Inc. v. Benton County*, 136 Wn. App. 314, 321-22, 148 P.3d 1092 (2006).

TRIAL COURT'S ANALYSIS AND RECONCILIATION

¶20  The trial court here concluded that Washington Beef provided the necessary clear, cogent, and convincing evidence to overcome the presumption that the appraiser used the correct approach to valuation. Washington Beef's burden of proof for establishing the proper valuations then shifted to a preponderance of the evidence. *Weyerhaeuser*, 126 Wn.2d at 382.

¶21  The County assessor did not use the comparable sales approach because AgriBeef bought Washington Beef Inc. after the appraisals here, and because no similar properties had been sold recently. Washington Beef, nonetheless, argued that the recent sale of this plant was the best indicator of its value. It showed that only $4,749,000 of the $32,250,000 sale price was actually allocated to the plant. The trial court gave only "some weight" to the 2003 sale of the assets of Washington Beef Inc. to AgriBeef "because of the distress situation in which the sale occurred." CP at 39. And Washington Beef Inc. and AgriBeef had also had an ongoing business relationship. The dispute over these tax assessments was ongoing during the negotiations and sale of the assets. And so the court found evidence of the allocation of the sale proceeds to the plant unpersuasive.

¶22  Beginning in the late 1990s, Washington Beef Inc. suffered declining sales in Japan, reduced capital from its Japanese owners, a tightening of the market for slaughter-ready cattle due to new Canadian processing plants, and a

2001 labor strike. The court's finding of a distress situation is then easily supported by this record. The record also shows that AgriBeef had a presale partnership with Washington Beef Inc. in a feedlot that supplied 10 percent of Washington Beef's slaughter-ready cattle. At the time of the 2003 sale, AgriBeef was also a creditor of Washington Beef Inc. and had been working on the purchase for at least two years. AgriBeef also knew that Washington Beef Inc. had challenged the recent tax appraisals. This evidence supports the trial court's finding that the allocation of the proceeds of the sale of Washington Beef Inc. to AgriBeef did not reflect the value of the plant as of January 2003.

¶23 The court then went on to explain in its findings of fact that the County appraiser employed the " 'reproduction cost new' method." CP at 30. It requires the application of trade and depreciation tables to value assets at current dollars. CP at 30. The final result was trended up for appreciation and down for depreciation. The trial court found, however, that this approach did not account for extraordinary economic obsolescence (obsolescence external to the plant and facilities themselves).

¶24 Washington Beef showed through its expert witness, Stephen Olson, that the beef industry in general and Washington Beef in particular faced sustained economic hardships during the years appraised. The factors creating this extraordinary economic obsolescence included (1) decline in beef prices, (2) static demand for beef products, (3) loss of the Canadian cattle sources, (4) partial loss of the Asian market, (5) increasing dominance in the industry by four major companies, and (6) high transportation costs.

¶25 Washington Beef's expert, Mr. Olson, calculated the amount of economic obsolescence as $17,400,000. The County assessor determined that the plant suffered no economic obsolescence. In fact, he concluded that the plant had actually appreciated in value. Mr. Olson gave no weight to the cost approach because he concluded that it did not reflect the extraordinary economic obsolescence and the deteriorating performance of Washington Beef.

¶26 Generally the cost method accounts for economic obsolescence. *Cascade Court*, 105 Wn. App. at 570. The trial court concluded that all the forces at work, including both business and consumer activity, had to be considered in valuing the plant. Ultimately, the trial court concluded that the County's cost approach was credible but did not fully express the value due to its failure to make adjustments for economic obsolescence. The court then adjusted for economic obsolescence.

¶27 Washington Beef used two value indicators for the income approach: a discounted cash flow model and a direct capitalization model. In the discounted cash flow approach, a forecast was made for the current year, followed by estimated growth and profitability forecasts for an additional four years. The direct capitalization approach considers the historical performance of the business. It is averaged to arrive at a normalized cash flow estimate that is then capitalized. Ex. 15, at 23. Both approaches used the plant's income from 1995 to 2002 to "normalize" the income stream.[2] Ex. 15, at 23-24. Washington Beef's expert, Mr. Olson, reconciled the results of these two methods and concluded that the 2001 market value was $8,000,000, the 2002 market value was $5,700,000, and the 2003 market value was $5,000,000. Ex. 15, at 30-31.

¶28 The County hired Kansas appraiser Michael Goodwin to review Mr. Olson's computations. He reported mistakes he discovered in Mr. Olson's work. Mr. Olson then adjusted the values to those offered at trial: $6,901,750 in 2001; $5,801,750 in 2002; and $3,650,750 in 2003. Mr. Goodwin's market values, using corrected income and expense figures, were between $30 million and $49.4 million for 2001 and between $34.9 million and $38.1 million for 2002 (Mr. Goodwin reviewed only the 2001 and 2002 reports on market value prepared by Mr. Olson).

---

[2] Mr. Olson explained how the income stream was normalized: "We have used the Washington Beef history from 1995 through 2002 to arrive at historical norms in terms of growth and margins as a percent of sales." Ex. 15, at 24.

¶29 The trial judge considered all three methods for determining the fair market value of Washington Beef's plant and found that none of them alone was determinative. He concluded that the main weaknesses in the County's cost approach to the assessments were that the County failed to take into account economic obsolescence. The County failed to make adjustments for recent circumstances in the beef processing industry. The court relied largely on Mr. Goodwin's review of Mr. Olson's report to find that Washington Beef's income approach used cash flows too low and discount and capitalization rates too high to accurately estimate the plant's fair market value (again, the higher the capitalization rates, the lower the value of the assets). The court also noted that Mr. Olson failed to consider alternative uses of the property. Finally, the trial judge gave some weight to the 2003 sale of the plant to AgriBeef, although he concluded that the sale was not at arm's length.

¶30 In reconciling these methods and values, the trial court gave some weight to the 1998 appraisal of the plant ($25 million) and the $50 million policy bought in 2002 to insure the plant's boilers and machinery. It concluded that a "modest downward departure" from the original assessments was required. The trial court then concluded that the plant was overvalued by $5,717,200 in 2001, by $4,750,400 in 2002, and by $6,718,453 in 2003.

■■ ¶31 Washington Beef argues that the trial court improperly based its valuations on exempt intangibles, a violation of RCW 84.36.070(2)(c). The statute states that intangible personal property is exempt from ad valorem taxation. RCW 84.36.070(1). The definition of "intangible personal property" includes "favorable contracts, favorable financing agreements, reputation, exceptional management, prestige, good name, or integrity of a business." RCW 84.36.070(2)(c). Washington Beef contends the trial court valued the plant based on AgriBeef's separate assets—including its favorable contracts and financing agreements—rather than on Washington Beef Inc.'s actual eco-

nomic circumstances. Then it directs us to language on page 16 in the trial court's memorandum opinion:

> Washington Beef was a good fit for AgriBeef and could have been a good fit for another investor. It allowed AgriBeef to establish a greater presence in the west coast corridor and to strengthen its position in the industry. It did not see Washington Beef as a stand alone investment separate from its overall operation but rather something that could fit nicely with it. This is how the Court interprets the County's position on the diversifications by an investor, as it applies specifically to this case.

CP at 166-67. But the trial judge explained this reference after Washington Beef moved for reconsideration:

> The Court did not consider assets outside the scope of the authority herein. The reference to page 16 of the Court's opinion is misplaced. The Court was trying to explain at that point in the opinion its position on the inadequate efforts to market Washington Beef. The record does not, in the Court's view, support the conclusion that the marketing campaign was vigorous or that it reached the universe of buyers who could have been a good fit with Washington Beef.

CP at 48. The trial court described Washington Beef's investment appeal in this way:

> For AgriBeef, Washington Beef represented a way to diversify and integrate its own cattle production operations and expertise with a modern cattle processing facility having good local management, proximity to AgriBeef cattle and shipping to the Pacific coast states and Asia, special depreciation allowances under the Internal Revenue Code [because the plant is on an Indian reservation], and good prospects for future profitability.

CP at 28 (Finding of Fact 21). The trial court also found that Washington Beef did not make a vigorous attempt to find other purchasers, and noted that none of the debt assumption ($22,000,000) that constituted most of the purchase price was allocated to the plant. CP at 29 (Findings of Fact 23, 24).

¶32 The potential income-producing ability of the property appropriately influences its value. *Cascade Court*, 105 Wn. App. at 570 n.32. The trial court, as well as the assessor, must consider all factors that can affect the negotiations between the willing buyer and the willing seller. *Id.* at 567. Those factors may also indicate that the actual purchase price does not reflect the price a willing buyer would offer in a more arm's length negotiation. But nothing in these findings and conclusions suggests that the court based its valuations on AgriBeef's financial health rather than on Washington Beef's economic circumstances. The quoted statements on diversification and "fit" reflect only the trial court's decision not to use the 2003 sale price as an indicator of market value. The trial court did not then consider intangible assets in reaching its conclusions on fair market value.

¶33 Washington Beef next contends the trial court erred by not setting out the formula it used for its calculations, and in particular by not showing that it accounted for economic obsolescence. But that is not the question before us. The question is whether the court's valuation can be said to be within the range of the evidence presented by these experts during this trial. *Boise Cascade Corp. v. Pierce County*, 84 Wn.2d 667, 678, 529 P.2d 9 (1974).

¶34 Again, this is because "appraising property is more of an art than a science . . . . [I]t necessarily deals in imponderables and may involve wide disputes in expert opinion or judgment. Even functional obsolescence is a vague and imprecise concept, and when related to the idea of economic obsolescence it becomes even more so." *Id.* at 680 (Hale, C.J., concurring). Washington Beef asks that the trial judge do something none of the experts here was able to do: come up with one specific formula for arriving at the value of this plant and facilities. That is not possible and it is not required. *Id.* at 678. Fair market value is a matter of opinion rather than of hard fact. Each expert witness is called upon to use his or her judgment regarding the appropriate factors to be considered in each particular case.

*Nw. Chemurgy Sec. Co. v. Chelan County*, 38 Wn.2d 87, 94, 228 P.2d 129 (1951). A trial court is entitled to rely on its determination of the credibility of these expert witnesses. *Xerox Corp. v. King County*, 94 Wn.2d 284, 287, 617 P.2d 412 (1980).

¶35 Here, the trial court considered relevant facts and expert opinions on fair market value. It made factual determinations with the proper standards in mind. Indeed, the trial judge showed a good understanding of the accounting and economic principles in play here. We will not then substitute our judgment for that of the trial court. *Boise Cascade*, 84 Wn.2d at 676; *see also Xerox*, 94 Wn.2d at 288 (when a trial court clearly recognizes and understands the appraisal principles asserted by the parties' experts, this court cannot substitute its judgment for that of the trial court). The trial court's valuations are within the range of expert opinions on the fair market value of the Washington Beef plant. It did not assign a monetary value to the extraordinary economic obsolescence. But it did not have to. The trial court took economic obsolescence into consideration. No further findings were necessary. The findings of fact are supported by the evidence and support the conclusions of law. The values are well within the range of that evidence.

County's Cost Approach

¶36 Washington Beef next contends the trial court erred in giving any weight to the County's cost approach to valuation. The trial court concluded that the County's trended investment cost method[3] and direct capitalization[4]

---

[3] The trended investment cost method is used to develop replacement cost values. Original values of a company's assets are first multiplied by the "trend factor" (from appreciation and depreciation tables) of the year the assets were acquired in order to bring the assets' value up to current dollars. 11 Report of Proceedings (RP) at 13-14. Then the values are given a trended or depreciated value. The goal is to estimate the current cost to reproduce the assets. 11 RP at 13-15.

[4] The direct capitalization of income method "converts a stabilized year of cash flow from a business or industry to value by dividing the cash flow to capitalize by

analysis were sound, credible, and entitled to substantial weight. But the court also concluded that these approaches did not account for recent circumstances in the beef industry and therefore for economic obsolescence. Washington Beef says the court erred as a matter of law because once the court rejected the County's cost analysis, the court could not, or should not, have then turned around and used it.

¶37 The taxpayer's burden of proof shifts to a preponderance of the evidence once a taxpayer proves by clear, cogent, and convincing evidence that an assessor's overall approach is incorrect. *Weyerhaeuser*, 126 Wn.2d at 381. Washington Beef argues under the authority of *Weyerhaeuser* that the court must then reject the County's approach completely. It is mistaken. Only the presumption of correctness is overcome. *Id.* at 382.

¶38 Here, the trial court found that even with its weaknesses, the County's cost approach, which included the normalized cash flows developed and capitalized by the assessor, more accurately reflected the plant's fair market value. Ultimately, the trial court reconciled calculations derived from the cost approach with calculations derived from the income approach (as adjusted by the County's expert, Mr. Goodwin). The trial court's decision is supported by the evidence because both approaches are reliable for valuing complex properties when there are no comparable sales available. Former RCW 84.40.030(2); *see Welch Foods*, 136 Wn. App. at 326.

TRIAL COURT'S CONSIDERATION OF OTHER FACTORS

¶39 Finally, Washington Beef contends the trial court erred when it refused to conclude that the allocation to the plant of $4.749 million of the $32.25 million purchase price paid by AgriBeef reflected the fair market value. It also contends the trial court erred in giving any weight to the 1998 appraised value of the plant or to the level of casualty insurance for the plant's machinery.

an appropriate capitalization rate." CP at 31-32. This is the preferred method of the Washington State Department of Revenue for evaluating the income potential of industrial properties. CP at 32.

¶40 Again, the trial court found that the allocation of asset values in the sale price was not a proper reflection of the plant's fair market value in 2003 because (1) Washington Beef was in distress at the time, (2) Washington Beef and AgriBeef had been in partnership and debtor-creditor relationships during the marketing and sale of the plant, (3) the lawsuit challenging the tax assessments was pending during the marketing and sale, and (4) none of the debt-assumption that comprised most of the consideration for the sale was allocated to the plant. Washington Beef urges us to apply a formula for determining its nontaxable assets at the time of the sale of the plant. It wants the court to add $5,300,000 in net working capital to $22,000,000 in liabilities and then deduct that sum from the sale price of $32,250,000. The resulting figure is $4,950,000 in taxable assets, including land.

¶41 The County responds that the allocation of $4,749,000 to taxable assets was made with these pending tax refund claims in mind. And the County directs our attention to Washington Beef's own independent auditor's report (Ex. 5). The County contends the depreciated value of the taxable land, buildings, and equipment was nearly $45 million in November 2002. Actually, the auditor's report shows that the value of the land, buildings, and equipment "less accumulated depreciation" on that date was about $26,100,000. Ex. 5, at 2. But even this lower value in November 2002 is more than four times the value Washington Beef allocated to taxable assets five months later, when the assets were sold. The trial court found this allocation for the sale less credible because Washington Beef and AgriBeef had a prior business relationship, AgriBeef had been working on buying Washington Beef since 2001, and AgriBeef was aware of the pending tax assessment challenges. We will not weigh the evidence, judge the credibility of the witnesses, or substitute our judgment for the trial court's. *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

¶42 We also defer to the trial court's discretionary decisions on other contested evidence. *Johnson v. Dep't of*

*Licensing*, 71 Wn. App. 326, 332, 858 P.2d 1112 (1993) (the trial court determines disputed facts by weighing the credibility of the testimony); *In re Welfare of Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973) (the appellate court is not entitled to weigh the evidence or the credibility of the witnesses). For instance, the trial court gave some weight to a statement by Washington Beef's president that the plant was privately appraised with a value of $25 million in 1998. The president stated that this appraisal was a promotional sales action. But that does not mean that the trial judge could not weigh the testimony as he saw fit. *Greene*, 97 Wn. App. at 714.

¶43 The trial court had the same discretion to consider the $50 million in casualty insurance Washington Beef bought in 2002 to cover the $38 million to $39 million replacement value of the plant's boilers and machinery. Washington Beef contends the trial court should not have given weight to either the 1998 appraisal or the casualty insurance. But these independent valuations of the plant property were admissible evidence subject to the trial court's determination of their relevance and weight.

ATTORNEY FEES

¶44 The County requests reasonable attorney fees and costs under RAP 18.9(a) for responding to a frivolous appeal. An appeal is frivolous when, after considering the record and resolving all doubts in favor of the appellant, there are no reasonably debatable issues. *Tiffany Family Trust Corp. v. City of Kent*, 119 Wn. App. 262, 275, 77 P.3d 354 (2003), *aff'd*, 155 Wn.2d 225, 119 P.3d 325 (2005). Washington Beef raised debatable issues. We then decline the County's request for attorney fees.

¶45 We affirm the judgment of the trial court.

BROWN, J., and STEPHENS, J. PRO TEM., concur.