[No. 62399-6.    En Banc.    May 11, 1995.]

WEYERHAEUSER COMPANY, *Appellant*, v. F. PAUL EASTER, *Respondent*.

372

*Stoel Rives Boley Jones & Grey,* by *Norman J. Bruns,* for appellant.

*H. Steward Menefee, Prosecuting Attorney for Grays Harbor County,* and *Jennifer L. Wieland, Chief Civil Deputy,* for respondent.

*George C. Mastrodonato* on behalf of Simpson Investment Company, amicus curiae for appellant.

*Donald P. Swisher* and

*David L. Canary* on behalf of The Institute of Property Taxation, amicus curiae.

Guy, J. — To comply with state and federal environmental standards, Weyerhaeuser Company agreed to invest $8.7 million in pollution control equipment to reduce effluent from its pulp mill in Cosmopolis, Washington. Weyerhaeuser also voluntarily adopted a plan to remove asbestos and PCB's from the plant, at a cost of $18.3 million and $2.5 million, respectively. At issue is whether these anticipated costs of pollution control reduced the market value of the pulp mill and, as a consequence, reduced Weyerhaeuser's property taxes.

FACTS

The Mill

Weyerhaeuser built the Cosmopolis mill in 1957 to produce dry pulp for paper products. In 1966 and again in 1971, the company expanded the capacity of the plant by adding new equipment. All capital investments after 1971 were to maintain production at the same capacity.

The mill uses an obsolete technology, the sulfite process, to produce high grade pulp. To transform wood chips into pulp, a mill must dissolve the lignin which binds wood fibers together, and the sulfite process uses an acidic solution of magnesium sulfite to digest the lignin. The byproducts of this chemical reaction require substantial treatment before the mill may safely discharge them.

Once the fibers separate, the mill washes the pulp and bleaches it with elemental chlorine, leaving potentially hazardous chlorinated organic compounds (AOX) as wastes. To prevent the production of AOX, in 1990 the mill began using oxygen rather than chlorine to bleach the pulp, a process called oxygen delignification.

Paper companies have largely abandoned sulfite mills in favor of a more efficient technology, the Kraft process. Introduced in the 1950's, Kraft mills use a combination of heat, pressure, and sulfates to separate wood fibers. Although it produces a lower grade of paper by leaving a great deal of lignin in the pulp, the Kraft process yields much more pulp

from wood chips compared to the sulfite process.[1] Yield is critical to a plant's profitability because wood chips are the single largest cost in making pulp (42 percent of total cost at Cosmopolis).

The Kraft process is much cleaner than its sulfite counterpart. Not only must sulfite mills neutralize their caustic byproducts, the waste treatment itself creates new, dangerous effluent. The sulfite process is inherently "dirtier".

Sulfite mills have survived only because they manufacture high quality pulp for niche products. "These remaining markets, requiring high purity and tolerating low yield, are primarily in acetates for filters, fluff pulps for absorbent pads and toweling, color photographic stock and other high grade papers". Clerk's Papers, at 225. As Kraft plants become more efficient and effective, they make further encroachments on these residual markets.

## Pollution Control

Because of the toxic byproducts of the sulfite process, Weyerhaeuser has installed various pollution control devices on the mill. During the late 1980's, the State required Weyerhaeuser to make a substantial investment in new pollution control facilities.

The State Department of Ecology (DOE) ordered Weyerhaeuser to decrease the amount of fecal coliform in the mill's effluent. Downstream from the mill is Grays Harbor and the second largest commercial oyster beds in the state. The oysters allegedly thrive on the coliform bacteria, but then test positively for fecal contamination, preventing their sale. With the DOE's approval, the mill killed the coliform by treating effluent with sulfuric acid. This reduced the pH balance of the discharge to 3 — highly acidic.

Because the Federal Environmental Protection Agency (EPA) prohibits the release of acidic effluent, in 1985 the DOE ordered the mill to neutralize the waste before releas-

---

[1]The Cosmopolis mill averages a yield of 38 percent bleached pulp from wood chips; newer Kraft mills yield 60 percent.

ing it. In 1988, the DOE and Weyerhaeuser agreed that Weyerhaeuser would build the necessary facilities to treat the wastes by no later than March 1, 1991. The expenditures for new pollution control facilities at issue resulted from that agreement.

Weyerhaeuser adopted a plan to spend $8.7 million to neutralize the effluent through oxygen delignification. Had Weyerhaeuser not taken this step, the DOE would have closed the mill by March 1, 1991. By January 1, 1990, the date of the assessment, Weyerhaeuser had $5.5 million worth of construction in progress on the project and a remaining obligation of $3.2 million. The mill completed the project before the March 1, 1991, deadline.

In addition to the treatment of effluent, Weyerhaeuser had two other cleanup projects in progress at the time of the assessment. First, the company committed to remove most of the asbestos in the plant at a cost of $18.3 million. Second, the company decided to remove transformers which contained PCB's. The total cost of this removal over 5 years was estimated to be $2.5 to $3 million.

Neither of these two cleanups was required by law; Weyerhaeuser approved both projects as a perceived business necessity.

### The Assessment and Subsequent Appeals

Grays Harbor County follows a 4-year cycle for tax valuation. The assessor's value would establish the basis for Weyerhaeuser's liability for property taxes during the next 4 years.

Appraisers have three general methods to estimate the value of property: comparable market sales, the cost approach, and the income approach. *See Sahalee Country Club, Inc. v. Board of Tax Appeals*, 108 Wn.2d 26, 33, 735 P.2d 1320 (1987). Because a market for used pulp mills does not exist, the assessor had no comparable sales with which to estimate the value of the mill. Instead, the assessor used an appraisal technique known as the cost approach or, more specifically, reproduction costs new less depreciation (RCNLD). The fundamental premise of RCNLD is substitution: a rational investor would not

pay more for a plant than the cost of constructing an exact replica.

To estimate the reproduction costs and depreciation of the Cosmopolis mill, the county assessor relied on the trended investment technique. This technique begins with the price of each of the plant's components at the date of purchase, 1957 to the present, multiplies the price by one factor to calculate a current reproduction cost, and then multiples the reproduction cost by a second factor to calculate a depreciated cost. The historical costs of building the plant are trended up to current levels then trended down to a depreciated level, hence the name of the technique.

To aid assessors, the Department of Revenue publishes tables of reproduction and depreciation numbers, including a column for pulp and paper mills. The Grays Harbor assessor looked through Weyerhaeuser's books, noted the age and historical costs of each of the mill's assets, multiplied them by the appropriate reproduction and depreciation factors, totaled the amounts, and announced the RCNLD of the Cosmopolis plant: $58,597,765.

Weyerhaeuser contested the assessment and hired its own appraiser, Stephen Olson. He used both the cost and income[2] approaches to estimate the value of the mill, concluding that the mill was worth $35,500,000 on January 1, 1990. Armed with this information, Weyerhaeuser appealed the assessment to the Grays Harbor County Board of Equalization. On September 28, 1990, the Board of Equalization upheld the County's assessment.

Weyerhaeuser appealed to the Board of Tax Appeals (Board) and, under RCW 82.03.140, elected a formal hearing. For 8 days in December 1991, the Board heard testimony from Weyerhaeuser and the County. On September 18, 1992, the Board announced its decision — the Cosmopo-

---

[2]The income approach calculates value by estimating the future benefits produced by assets. In this case, Olson measured the worth of the pulp mill by calculating the plant's expected returns after expenses for the remainder of its useful life. Olson concluded the cost approach provided the more accurate appraisal.

lis mill was worth $46,854,100, some $11.8 million less than the assessor's value.

The Board disagreed with the assessor on one key assumption. The assessor believed the value of an operating pulp mill could not fall below 20 percent of its reproduction cost for two reasons. First, the value of standby capacity, Weyerhaeuser's ability to bring a mothballed mill back on line quickly, was worth 10 percent. Second, the salvage value of the mill was 10 percent based on a study of closed sawmills in the 1970's. Under this 20 percent rule, the assessor had denied Weyerhaeuser various deductions from reproduction cost for the mill's obsolescence.[3]

The Board rejected the assessor's 20 percent rule, concluding:

> Given that no new sulfite mills have been built anywhere in the world since the 1970s, we agree with Mr. Olson that the plant's salvage value is likely zero. We find there is no basis in fact for the Assessor's 20 percent limit as applied to the subject property, and therefore the Assessor's justification for refusing to allow additional functional obsolescence is based on an untenable reason.

Clerk's Papers, at 54.

The Board then ruled on three deductions from value which the assessor had disallowed: costs of new pollution control equipment, removal of asbestos, and removal of PCB's. The Board denied Weyerhaeuser a deduction for costs of new pollution control equipment, but concluded that the costs of removing asbestos and PCB's did reduce the value of the plant. The Board reduced the assessment accordingly.

On September 25, 1992, Weyerhaeuser appealed the Board's ruling to the Superior Court for King County. Weyerhaeuser contended the Board incorrectly disallowed the

---

[3]Functional obsolescence is "a reduction in utility of the structure, or of one or more of its components, resulting from the decreased capacity of the structure or component to perform the function for which it is intended . . . It is labeled 'functional obsolescence' because it reflects the fact that the structural component is outmoded or inefficient, judged by current market standards of performance or acceptability." Byrl N. Boyce & William N. Kinnard, Jr., *Appraising Real Property* 298 (1984).

deduction for new pollution control equipment and applied the incorrect discount rate to its calculations of present worth. On September 9, 1993, the Superior Court affirmed the Board's decision.

Weyerhaeuser sought review in the Court of Appeals, and on December 6, 1994, the commissioner for this court accepted certification.

## ISSUES

Weyerhaeuser's appeal raises three issues: (1) what is the scope of the presumption of correctness given under RCW 84.40.0301 to an assessor's original appraisal? (2) under what conditions are the expenses of pollution control equipment deductible from assessed value? and (3) did the Board err by failing to use the correct discount rate in its calculations?

## ANALYSIS

Weyerhaeuser elected a formal hearing before the Board and, therefore, review of the Board's decision occurs under the State's Administrative Procedure Act. *See* RCW 82.03.180. Under the act, this court may reverse an order of the Board if the order is arbitrary or capricious. RCW 34.05.570(3)(i). In addition, the court decides whether the Board's findings of fact are "supported by evidence that is substantial when viewed in light of the whole record before the court". RCW 34.05.570(3)(e). The court reviews the Board's legal conclusions for an error of law. RCW 34.05.570(3)(d).

■ The purpose of our scrutiny under the Administrative Procedure Act is to ensure the Board valued consistently the property at issue. We do not directly review the County's appraisal, nor do we seek to dictate a specific appraisal value.

[T]he assessor "should be afforded considerable discretion" in her choice of the proper valuation method(s). *Folsom v. County of Spokane*, 106 Wn.2d 760, 769, 725 P.2d 987 (1986); *Chief Seattle Properties, Inc. v. Kitsap Cy.*, 86 Wn.2d 7, 25, 541 P.2d 699 (1975); *King Cy. v. Department of Rev.*, 32 Wn. App. 617, 621, 649 P.2d 126 (1982).

*Sahalee Country Club, Inc. v. Board of Tax Appeals*, 108 Wn.2d 26, 36, 735 P.2d 1320 (1987); *see Xerox Corp. v. King*

*Cy.,* 94 Wn.2d 284, 288, 617 P.2d 412 (1980) (court refuses "to become embroiled" in the application of a particular appraisal principle).

## Presumption of Correctness

The Legislature has directed that courts and appellate bodies presume the assessor's original determination of value is correct.

> Upon review by any court, or appellate body, of a determination of the valuation of property for purposes of taxation, it shall be presumed that the determination of the public official charged with the duty of establishing such value is correct but this presumption shall not be a defense against any correction indicated by clear, cogent and convincing evidence.

RCW 84.40.0301.

The purpose of this presumption is to clarify a taxpayer's burden for challenging a tax assessment. Prior to adoption of the statute in 1971, Washington courts had fashioned a standard of constructive fraud which required a taxpayer to prove not only that an assessment was incorrect, but also that the assessor's error "is so palpably exorbitant and excessive as to amount to constructive fraud or to violate some constitutional principle." *Ozette Ry. v. Grays Harbor Cy.,* 16 Wn.2d 459, 467, 133 P.2d 983 (1943); *see also Boise Cascade Corp. v. Pierce Cy.,* 84 Wn.2d 667, 672, 529 P.2d 9 (1974) ("grossly inequitable and palpably excessive overvaluation").

We first interpreted the presumption of correctness in *Xerox Corp. v. King Cy.,* 94 Wn.2d 284, 617 P.2d 412 (1980). After acknowledging the conflicting language in the court's prior opinions, we held that "when the assessor proceeds to assess on a fundamentally wrong basis, the statute mandates *any* correction indicated by clear, cogent and convincing evidence. Thus the correction need not be so great as to be a constructive fraud." *Xerox,* 94 Wn.2d at 290. In *Northwest Natural Gas Co. v. Clark Cy.,* 98 Wn.2d 739, 744, 658 P.2d 669 (1983), the court announced the current standard for a taxpayer's correction of an assessment:

[A] taxpayer who challenges a property valuation for tax purposes must show by clear, cogent and convincing evidence that: (1) there has been an overvaluation; and (2) the overvaluation was either (a) grossly inequitable and palpably excessive or (b) made on a fundamentally wrong basis.

The Board in this case concluded the assessor calculated the 20 percent rule on a fundamentally wrong basis.

We take this opportunity to clarify the taxpayer's burden of proof and eliminate the requirement that an overvaluation be grossly inequitable, palpably excessive, or fundamentally wrong. Once a taxpayer proves a correction to the assessment by clear, cogent and convincing evidence, the taxpayer has met the statutory burden of proof.

The presumption of correctness does not require burdens on the taxpayer beyond those created by the statute. As the court recognized in *Xerox*, the statute encompasses "any correction" big or small, whether or not grossly inequitable, palpably excessive or fundamentally wrong. *Xerox*, 94 Wn.2d at 290. These latter requirements are holdovers from an earlier era when the standard was constructive fraud. By adopting the presumption of correctness, the Legislature sought to end the confusion and create a clear, and exclusive, burden of proof for taxpayers. We now give force to the Legislature's intent.

Turning to the issue of the standard of proof, Weyerhaeuser argues that because the Board rejected the assessor's 20 percent floor, the standard of proof shifted from clear, cogent and convincing evidence to a preponderance of the evidence. Weyerhaeuser cites two decisions in support. First, in *Folsom v. County of Spokane*, 111 Wn.2d 256, 272, 759 P.2d 1196 (1988), this court ruled that "the presumption operates only after the assessor applies the method prescribed by statute, as construed." Second, in *Britton v. Kaiser Aluminum & Chem. Corp.*, Nos. 39222-39223 and 39317-39318, 1992 WL 214905, at *7 (Wash. Bd. Tax App. June 9, 1992), the Board ruled that where the assessor relies on a flawed approach to estimating value, the standard of proof on the taxpayer shifts to a preponderance of the evidence.

Weyerhaeuser claims the Board erred by not applying the lower standard of proof to the deductions for pollution control in this case.

Correction of the invalid 20 percent rule creates a unique problem for the presumption. Normally, clear, cogent and convincing proof of a correction includes evidence of both the assessor's error and the correct value. Once the taxpayer meets the standard of proof, the reviewing tribunal substitutes the taxpayer's value for the assessor's. Here, though, the assessor's error is distinct from the correct valuation. Weyerhaeuser disproved a general floor on allowable deductions for obsolescence. The assessor disallowed a number of otherwise valid deductions, including some for pollution control equipment, because the estimated value of the mill had dipped below 20 percent. The question remains — what deductions should the assessor have allowed?

■■ We adopt the following test to determine the appropriate standard of proof: (1) if a taxpayer overcomes the presumption of correctness on a specific value, the standard of proof shifts to preponderance of the evidence for all contested issues related to that value; and (2) if a taxpayer overcomes the presumption on the assessor's overall approach or technique, *i.e.*, invalidates the technique, the standard of proof shifts to a preponderance of the evidence for all issues. The taxpayer retains the burden of persuasion at all times.

The first part of the test covers particular values within an assessment. Most appraisals of commercial properties involve several separate judgments on the value of complex assets. An assessor's error on one decision does not necessarily invalidate the entire assessment, nor should it eliminate the presumption of correctness for unrelated judgments. Such is the situation here. The assessor's erroneous reliance on the 20 percent rule invalidates only those deductions disallowed under the rule. The presumption of correctness still applies to unrelated values.

The second part of the test covers situations like that in *Kaiser Aluminum*. In *Kaiser*, the assessor originally used

the discounted cash flow (DCF) method of the income approach to estimate the value of an aluminum smelter and a rolling facility. On appeal, the assessor produced a new appraisal which substantially revised its prior assessment.

The assessor's second appraisal was a tacit admission that the first was fundamentally flawed, and the Board so noted. *Kaiser Aluminum*, at *8 ("Assessor's original DCF approach is flawed"). Thus, the standard of proof shifted to a preponderance of the evidence on all issues in the assessment. In *Folsom*, this court recognized the same principle although in reverse order. When the assessor fails to use the correct statutory methodology, the presumption of correctness does not apply. *Folsom*, 111 Wn.2d at 272.

Corrections which invalidate only one part of an assessment do not overcome the presumption on the remainder. Corrections which invalidate the methodology or approach of the entire assessment overcome the presumption entirely. Under both circumstances, once a taxpayer has overcome the presumption, the standard of proof on contested issues shifts to a preponderance of the evidence.

The Board therefore erred when it evaluated Weyerhaeuser's deduction for the $8.7 million pollution control equipment under the clear, cogent and convincing standard. By disproving the 20 percent rule, Weyerhaeuser invalidated the assessor's reason for denying all deductions for pollution control, whether old or new. The appropriate remedy for the Board's error is to remand the case to the Board. On remand, the Board must weigh the proof of a deduction by a preponderance of the evidence.

### Deductions for New Pollution Control Facilities

We now turn to the central question in this case: how should an assessor appraise required expenditures on pollution control? Weyerhaeuser contends the Board reached a contradictory result in its final decision. On the one hand, the Board disallowed a deduction from value for the $8.7 million oxygen delignification system; yet, on the other hand, it allowed deductions for the $18.3 million removal of

asbestos and $2.5 million removal of PCB's from the mill. No relevant reason, according to Weyerhaeuser, exists to distinguish between them.

Three types of expenditures on pollution control are at issue. First, by January 1, 1990, Weyerhaeuser had constructed $5.5 million worth of the $8.7 million oxygen delignification system. Second, construction worth $3.2 million remained uncompleted. Thus, the Board had to value the new pollution control facilities in place ($5.5 million) as well as the facilities still to be constructed ($3.2 million). Third, Weyerhaeuser voluntarily adopted plans to remove PCB's and asbestos from the mill; environmental laws did not require their removal. Therefore, the Board had to assess the value of required expenditures for pollution control already made, required expenditures for work to be performed, and expenditures for work to be performed as a business necessity.

The Board disallowed any deduction from value for the oxygen delignification system, but allowed a deduction for the present value of the cost of removing the asbestos and PCB's. The Board's decision rested on this premise:

> [R]emoval of asbestos will not extend the economic life of the plant, whereas installation of pollution control equipment will extend the economic life of the plant. This difference explains the differing treatment of the respective types of investments in the cost approach: investments which add value to the existing plant (such as by extending the plant's economic life) should be added to the cost basis when made; investments which do not add value to the plant, but which are nevertheless required, should be deducted from the value of the plant until made.

Clerk's Papers, at 57.

We disagree with the premise and conclude that it leads to arbitrary results. The Board cited no authority or testimony in support of this distinction, and the record shows no discussion of this claim at the hearing. Furthermore, the phrase "investments which add value" is potentially confusing. All investments into a plant, to one extent or another, "add value". The important consideration for tax assessment is the effect the investment has on the plant's market value.

■ Our analysis, as well as the Board's, must begin with the mill's market value. *Sahalee Country Club, Inc. v. Board of Tax Appeals*, 108 Wn.2d 26, 30, 735 P.2d 1320 (1987) ("the bottom line is market value").

> Market value means the amount of money which a purchaser willing, but not obligated, to buy would pay an owner willing, but not obligated, to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.

*Mason Cy. Overtaxed, Inc. v. Mason Cy.*, 62 Wn.2d 677, 683-84, 384 P.2d 352 (1963). The purpose of the cost method and the trended investment technique is to estimate the market value of a plant when no market exists. As appraisal methods become more complex, they must not detract from the assessor's ultimate goal of determining the fair market value of property. *Sahalee*, 108 Wn.2d at 29.

■ The market value of a plant in compliance with environmental regulations is greater than an identical plant not in compliance. This difference in value measures a form of obsolescence — a noncomplying plant is obsolete compared to an otherwise identical counterpart. The International Association of Assessing Officers recognized this point:

> The cost to cure [contaminated properties] lessens utility of property and should be considered as a form of functional or economic obsolescence of improvements. This would then be added to the accrued depreciation, because current replacement cost new would be based on the assumption of a typical, presumably clean, environment.

International Ass'n of Assessing Officers, *Standard on the Valuation of Property Affected by Environmental Contamination* 6.2.1 (Aug. 1992). The Board has also adopted this standard. *Moreland Northwest Co. v. Brooks*, No. 41391-41393, 1993 WL 115858, at *4 (Wash. Bd. Tax App. Mar. 15, 1993) (environmental contamination is a form of obsolescence and "the cost to cure contamination is an allowable deduction"). The assessor implicitly recognized this concept in Weyerhaeuser's past assessments by deducting pollution control expenses as functional obsolescence.

■ To decide whether expenditures on pollution control qualify as a deduction, the Board has developed a 3-part

standard. The property owner must make a threshold showing of: "(1) the existence of contamination, (2) the existence of a requirement for cleanup, and (3) a reasonably certain estimate of the costs of cleanup, including a formal plan and timetable". Clerk's Papers, at 84. We agree with the Board that a taxpayer must make this showing before claiming pollution control expenses as a deduction from value.[4]

Under the standard, Weyerhaeuser's $8.7 million oxygen delignification system qualified for the Board's consideration as a deduction. The State required neutralization of the mill's effluents, and the cost to do this was reasonably certain.

The Board denied a deduction for the system, finding that the installed equipment would reduce production costs and extend the economic life of the plant. Because the system added value to the mill, the Board disallowed a deduction for the $3.2 million expenditure for work to be performed and increased the cost basis of the mill by the amount of the construction in progress, $5.5 million.

■ We conclude the Board erred by not allowing a deduction for the $3.2 million investment remaining. Appraisal theory distinguishes between curable and incurable obsolescence.

> Functional obsolescence is curable "when the cost of replacing the outmoded or unacceptable component is at least offset by the anticipated increase in utility, and hence ultimately in value, resulting from the replacement." . . .
>
> Incurable functional obsolescence is "Functional obsolescence that results from structural deficiencies or superadequacies that the prudent purchaser or owner would not be justified in replacing, adding, or removing, because the cost of effecting a cure would be greater than the anticipated increase in utility resulting from the replacement, addition or removal."

(Footnotes omitted.) Bryl N. Boyce & William N. Kinnard, Jr., *Appraising Real Property* 298-99 (1984) (quoting *Real*

---

[4]The Board of Tax Appeals has written a number of thorough, well-reasoned decisions on the valuation of pollution control facilities. Although we disagree with the Board's ultimate decision in this appeal, we do not wish to detract from its excellent work on the topic.

*Estate Appraisal Terminology* 114 (Byrl N. Boyce ed., rev. ed. 1981)). If environmental contamination is a form of functional obsolescence, then pollution control facilities which add value to a plant imply that the obsolescence is curable. The Board's decision has the effect of excluding curable obsolescence from consideration as a deduction. This is not true for typical examples of obsolescence and should not be true for pollution control.

We therefore direct the Board to consider the amount outstanding for the oxygen delignification system, $3.2 million, as it would any cost to cure functional obsolescence. We leave to the Board the determination of the *amount* of the deduction.

The valuation of the $5.5 million already spent on the system presents a separate question. Weyerhaeuser contends the assessor should depreciate the $5.5 million construction in progress down to the overall depreciation level of the mill — 23.8 percent or a total of $1.15 million. The Board disagreed.

> Immediately depreciating new plant equipment to an overall plant condition violates the basic premise of the trended investment technique (Goodwin testimony). The basic premise of the trended investment summation method assumes that each component of plant equipment has its own life; i.e., rate of depreciation (Goodwin testimony). The proper treatment of pollution control expenditures in the trended investment technique is to (1) recognize the full cost of the investment in the year in which it is made, and (2) allow normal depreciation over the remaining plant life (Goodwin testimony).

Clerk's Papers, at 74.

We find substantial evidence in the record which supports the Board's decision. The trended investment technique calculates separate values for each piece of equipment based on the date of purchase.[5] Depreciating the oxygen delignification system immediately would grant special

---

[5]The trended investment technique is an exception to the rule of summation. "[T]he object of value estimation in real estate appraisal is usually the whole property, not any of its component parts. . . . All segments together contribute to property value. Their fractional values cannot be used independently." Byrl N. Boyce & William N. Kinnard, Jr., *Appraising Real Property* 253 (1984).

treatment to this asset, in conflict with the valuation of the other parts of the mill. Consistency requires the Board to add the new equipment at full cost and then allow normal depreciation over the remaining life of the plant.

The Board allowed a deduction for the third type of pollution control expenditure in this case, removal of asbestos and PCB's as a business necessity. Here, Weyerhaeuser argued that the health and safety of workers, combined with a corporate directive, required the mill to remove all PCB's and asbestos. We find sufficient evidence in the record to support the Board's finding of a business necessity. The threshold showing of a requirement for cleanup does not solely mean proof of a legal requirement; proper evidence of business necessity is sufficient.

## The Market Discount Rate

Weyerhaeuser contends the Board endorsed a lower discount rate as correct, yet did not apply the rate throughout the assessment. The discount rate is central to calculating the present value of future payments and receipts. Weyerhaeuser desires a lower discount rate because it increases the value of deductions for future expenses.

The assessor responds that the Board criticized the discount rate used by Weyerhaeuser's appraiser in his income approach, but did not approve the rate for general use in the assessment.

The disputed language appears in the Board's finding of fact 32(c): "The discount rate used by Mr. Olson is not the market expected discount rate (Ifflander testimony), and improperly included a risk premium for small capitalization companies (Ifflander testimony)." Clerk's Papers, at 79.

The assessor observes correctly that the Board made this finding in the context of criticizing Mr. Olson's income approach. However, the market expected discount rate is a term of art, and this rate normally does not vary whether the appraiser uses the income or cost approach.

On remand, the Board should clarify the scope of the contested finding of fact.

## Conclusion

The cost to control pollution is a form of functional obsolescence. When cleanup is required and the cost is certain, assessors must determine whether the cost to cure pollution reduces the market value of the property.

We remand this case to the Board for further proceedings consistent with this opinion.

Durham, C.J., Dolliver, Smith, Johnson, Madsen, Alexander, and Talmadge, JJ., and Utter, J. Pro Tem., concur.