[No. 28563-4-III.   Division Three.   November 16, 2010.]

TIGER OIL CORPORATION, *Appellant*, v. YAKIMA COUNTY, *Respondent*.

*Frederick J. Dullanty Jr.*, *Stanley M. Schwartz*, and *Nathan G. Smith* (of *Witherspoon Kelley Davenport & Toole*), for appellant.

*Kenneth W. Harper* (of *Menke Jackson Beyer Ehlis & Harper LLP*), for respondent.

¶1 SIDDOWAY, J. — This case involves Tiger Oil Corporation's petition to recover property taxes paid on four shuttered convenience stores and gas stations in Yakima County, Washington, that are environmentally contaminated and subject to cleanup under Washington's Model Toxics Control Act (MTCA), chapter 70.105D RCW. Tiger Oil sought a reduction of the assessed value of its properties for costs of cleanup and market resistance factors. The trial court dismissed its petition by summary judgment, agreeing with Yakima County that because the parties have no information on the extent of the contamination, no expected method or time line for cleanup, and, as a result, no reasonable basis for determining an appropriate reduction in value, Tiger Oil had not demonstrated a genuine issue of material fact requiring trial. Tiger Oil appeals the dismissal, contending that summary judgment was improper because a genuine issue of material fact exists whether Yakima County fulfilled its obligations in arriving at its

value for the properties. It also contends that the trial court erred in applying the standard for reducing property value for pollution control adopted in *Weyerhaeuser Co. v. Easter*, 126 Wn.2d 370, 894 P.2d 1290 (1995). We hold that the *Weyerhaeuser* standard applies and affirm the trial court's summary judgment dismissal.

FACTS AND PROCEDURAL HISTORY

¶2 Tiger Oil,[1] a petroleum retailer, purchased four properties in Yakima County (County) in 1987 for $1.1 million cash. Clerk's Papers (CP) at 57. The properties are located in Yakima on West Nob Hill Boulevard, East Nob Hill Boulevard, North First Street, and Summitview Avenue. At the time of Tiger Oil's purchase, the West Nob property was subject to a 1982 order of the Department of Ecology (DOE) requiring cleanup of an estimated 20,000-gallon gasoline spill. Following its purchase of the properties, Tiger Oil installed spill containment and overfill protection equipment on the underground storage tank (UST) systems at the properties. Between 1987 and 2001, Tiger Oil operated gas stations and convenience stores at the properties and a bulk petroleum facility at the East Nob property.

¶3 In 1989, Washington adopted the MTCA. Following its adoption, each of the Tiger Oil properties was listed by DOE as a leaking underground storage tank (LUST) site, and Tiger Oil became involved in a dispute with DOE over the nature and extent of Tiger Oil's liability for cleanup. Because it could not operate the properties profitably and at the same time comply with DOE requirements, Tiger Oil ceased operations at the properties in 2001. In 2004, it entered into a consent decree with DOE and Federated Service Insurance Company by which Tiger Oil agreed to undertake remedial action, detailed in a "Cleanup Action

---

[1] The plaintiff, sometimes called "New Tiger" below, is an Idaho corporation that purchased the subject properties from Tiger Oil Company, a Washington corporation. Tiger Oil alleges that it was the former Washington "Tiger Oil" and its predecessor, Humble Oil, whose operations contaminated the properties.

Plan," and Federated provided financial assurances. The first steps identified by the Cleanup Action Plan were for Tiger Oil to remove the underground storage tanks, associated lines, and dispensers and deliver the report of an engineer or certified underground storage tank provider documenting results of the storage tank removal. Neither Tiger Oil nor Federated conceded liability for the contamination, and both reserved the right to seek reimbursement from nonparties to the consent decree.

¶4 The underground storage tanks were removed and the piping drained and capped in January 2005. Dispensers were removed thereafter. The UST decommissioning and site assessment report completed by Tiger Oil's contractor states that the storage tanks removed showed no evidence of leaks or holes. CP at 50, 58. DOE nonetheless continues to list the properties as LUST sites and identify Tiger Oil as a potentially liable party under MTCA for all four properties. Tiger Oil spent a total of over $2.5 million in environmental expenses on the properties and Federated spent over $900,000, beginning in 1990. CP at 54, 196. While taking these cleanup actions, Tiger Oil has continued to contest its liability for further cleanup and the methodology for cleanup mandated by DOE. For that or other reasons, it has not evaluated the extent of contamination remaining on its four properties or secured an assessment of the cost of cleaning up whatever contamination exists.

¶5 In 2004 and 2005, Tiger Oil paid 2003 and 2004 property taxes on the four properties under protest and filed tax refund petitions under RCW 84.68.020. It alleged that it has not generated income from the properties since 2001 and, due to the petroleum contamination and the cost of complying with environmental laws, the properties have little or no value. The parties' valuation positions are as follows:

|  | ASSESSOR | OWNER |
|---|---|---|
| **West Nob** | | |
| 2003 | Land: $124,850 | Land, unimpaired: $181,827 |
|  | Improvements: $116,600 | Land, impaired: ($323,919) |
|  |  | Improvements: $-0- |
| 2004 | Land: $123,250 | No distinction from 2003 |
|  | Improvements: $119,400 |  |
| **East Nob** | | |
| 2003 | Land: $112,850 | Land, unimpaired: $324,520 |
|  | Improvements: $378,200 | Land, impaired: ($310,597) |
|  |  | Improvements: $-0- |
| 2004 | Land: $112,850 | No distinction from 2003 |
|  | Improvements: $378,200 |  |
| **North First** | | |
| 2003 | Land: $109,500 | Land, unimpaired: $239,148 |
|  | Improvements: $199,000 | Land, impaired: ($312,329) |
|  |  | Improvements: $-0- |
| 2004 | Land: $109,500 | No distinction from 2003 |
|  | Improvements: $203,600 |  |
| **Summitview** | | |
| 2003 | Land: $96,900 | Land, unimpaired: $141,138 |
|  | Improvements: $143,400 | Land, impaired: ($330,741) |
|  |  | Improvements: $-0- |
| 2004 | Land: $96,900 | No distinction from 2003 |
|  | Improvements: $228,400 |  |

CP at 51, 53, 55, 57, 68, 69, 71.

¶6 Following discovery, the County moved for summary judgment dismissing Tiger Oil's petition, arguing that Tiger Oil's claim for refund depended on deducting speculative environmental remediation costs from the otherwise indicated market value. The County, relying on *Weyerhaeuser*,

126 Wn.2d 370, argued that before a taxpayer may claim that environmental cleanup costs reduce value, it must show not only the existence of contamination and a requirement for cleanup, but also a reasonably certain estimate of the costs of cleanup, including a formal plan and timetable. The County argued that Tiger Oil's valuation position was legally deficient under this applicable substantive law.

¶7 Tiger Oil responded by submitting declarations of an environmental consultant, Rory Galloway; its president, Chuck Conley; and its appraiser, Tim Vining; as well as transcripts of the depositions of Mr. Conley, Donald Abbott, an employee of DOE, and Greg Leadon, the county appraiser responsible for valuing the properties in 2003 and 2004. Mr. Vining's appraisal was submitted with his declaration and was the basis for Tiger Oil's negative valuation figures.

¶8 Mr. Vining's appraisal followed the method for valuing contaminated properties approved in *Moreland Northwest Co. (Unocal) v. Brooks*, Nos. 41391-41393, 1993 WL 115858, at \*4, 1993 Wash. Tax LEXIS 150, at \*11 (Wash. Bd. of Tax Appeals Mar. 15, 1993), which is to (1) discount the future value of the property in a clean condition to a present value and (2) subtract the discounted value of the remaining likely future cleanup costs. CP at 47. In arriving at a future value, Mr. Vining attributed no value to improvements on the properties, which he regarded as obsolete by current convenience store standards, and because they might be subject to demolition should soil underneath the buildings contain contaminants. His "clean," or "unimpaired," land-only values, totaling $880,000, were arrived at by analyzing sales of comparable uncontaminated properties. To arrive at his substantial negative "impaired" land value, Mr. Vining reduced the "clean" values to present value assuming a seven-year cleanup, deducting almost $1.5 million for estimated "costs to cure," and reducing the value by a further 15 percent of the unencumbered land value for stigma. At the same time, his declaration and appraisal and the declarations of Mr. Galloway and Mr. Conley asserted that the extent of contamination on the properties was unknown, as were the time line for and cost of cleanup. Tiger Oil argued that these materials raised issues

of fact as to the correctness of the County's assessment, including whether the assessor violated Washington law by failing to reduce the indicated value of the property for contamination.

¶9 In reply, the County argued that Tiger Oil's submissions conceded the gist of its motion: they demonstrated that no one, including Mr. Vining, had an estimate of the extent of contamination, let alone the cost or time line for cleaning it up. It argued, "If the law were as Tiger suggests, it would be a simple matter to engage in tax avoidance by swearing to the existence of unknown, unquantifiable, and unascertainable remediation costs." CP at 14. Instead, it argued, "these kinds of cases require at a minimum an evidentiary showing of at least a 'reasonably certain estimate' of the quantified costs of cleaning up the alleged environmental contamination." CP at 14.

¶10 The trial court granted the County's motion for summary judgment. Tiger Oil appealed.

ANALYSIS

¶11 Tiger Oil contends that summary judgment was improper for three reasons: First, because it demonstrated a genuine issue of material fact by establishing that the County failed to consider the existence of environmental contamination in valuing the properties as required by RCW 84.40-.030 and thereby applied an improper methodology; second, that the trial court erred in relying upon the *Weyerhaeuser* standard, which Tiger Oil contends is strictly limited to the amortization of pollution control equipment; and third, that the trial court erred in finding that evidence bearing on value did not create a genuine issue of material fact.

¶12 We review an order granting summary judgment de novo. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is proper if no genuine issue of material fact remains and the moving party is entitled to a judgment as a matter of law. CR 56(c). After the moving party submits adequate affidavits, the nonmoving party must set forth specific facts rebutting the moving party's contentions and disclosing that a genuine issue of

material fact exists. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986). Mere allegations or conclusory statements of facts, unsupported by evidence, do not sufficiently establish such a genuine issue. *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989). In addition, the nonmoving party "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." *Seven Gables Corp.*, 106 Wn.2d at 13. We view all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). Summary judgment is appropriate only if reasonable persons could reach but one conclusion from all the evidence. *Id.*

■ ■ ¶13 Assessors are entitled to a presumption of correctness. *Weyerhaeuser*, 126 Wn.2d at 379. The presumption is codified at RCW 84.40.0301:

> Upon review by any court, or appellate body, of a determination of the valuation of property for purposes of taxation, it shall be presumed that the determination of the public official charged with the duty of establishing such value is correct but this presumption shall not be a defense against any correction indicated by clear, cogent and convincing evidence.

Clear, cogent, and convincing evidence is a quantum of proof that is less than "beyond a reasonable doubt," but more than a mere "preponderance." *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 126, 615 P.2d 1279 (1980). It is the quantum of evidence sufficient to convince the fact finder that the fact in issue is "highly probable." *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973).

■ ■ ¶14 When weighing summary judgment in a civil case in which the standard of proof is clear, cogent, and convincing evidence, the court determines whether a rational trier of fact could find from the evidence in the record that the nonmoving party satisfied this evidentiary burden. *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008). Where the law creates a presumption, summary judgment may rest on a presumption in the absence of prima facie evidence to overcome it. *King County v. Dep't of Revenue*, 32

Wn. App. 617, 620, 649 P.2d 126 (1982) (citing *Bates v. Bowles White & Co.*, 56 Wn.2d 374, 353 P.2d 663 (1960)). With these standards and burdens in mind, the issue is whether Tiger Oil created a genuine issue of material fact by presenting a prima facie case with clear, cogent, and convincing evidence that would overcome the presumed validity of the County's assessment. *See King County*, 32 Wn. App. at 621.

I. ALLEGED IMPROPER METHODOLOGY

■■ ¶15 RCW 84.40.030 provides that for assessment purposes, real property "shall be valued at one hundred percent of its true and fair value in money." "True and fair value in money" for this purpose means fair market value. *Cascade Court Ltd. P'ship v. Noble*, 105 Wn. App. 563, 567, 20 P.3d 997 (2001). The assessor's valuation is required to be consistent with, among other factors, "physical and environmental influences." RCW 84.40.030(1). Environmental contamination is a physical and environmental influence of the type mentioned in RCW 84.40.030, which the assessor is required to consider. *Moreland*, 1993 WL 115858, at *3, 1993 Wash. Tax LEXIS 150, at *8. Tiger Oil argues that it created a genuine issue of material fact by demonstrating that the County did not consider the existence of environmental contamination in arriving at its 2003 and 2004 valuations, thus demonstrating a violation of state law that, without more, required trial.

■ ¶16 Tiger Oil additionally argued, and emphasized in oral argument, that an issue of fact as to methodology was created by its evidence that the County relied upon a "cost approach" to fair value, rather than the "comparable sales" approach identified as primary by Washington statute. Appraisers use three general methods to estimate the value of property: comparable market sales, the cost approach, and the income approach. *See Sahalee Country Club, Inc. v. Bd. of Tax Appeals*, 108 Wn.2d 26, 33, 735 P.2d 1320 (1987). RCW 84.40.030(1) provides that the primary criteria for assessing real property shall be "[a]ny sales of the property being appraised or similar properties with

respect to sales made within the past five years." RCW 84.40.030(2) provides that consideration may be given to cost approaches in addition and that, in certain circumstances, including property not having a record of sale within five years and not having a significant number of sales of similar property in the general area, cost or income approaches shall be the dominant factor. The assessor is afforded considerable discretion to decide the proper valuation method. *Sahalee*, 108 Wn.2d at 36.

¶17  Both of Tiger Oil's arguments of flawed county methodology are urged as bringing Tiger Oil within the principle that the presumption in favor of an assessor operates only after the assessor applies the method prescribed by statute, *Folsom v. County of Spokane*, 111 Wn.2d 256, 272, 759 P.2d 1196 (1988), or, as later formulated, that where a taxpayer overcomes the presumption on an assessor's overall approach or technique, i.e., invalidates the technique, the standard of proof shifts to a preponderance of the evidence for all issues. *Weyerhaeuser*, 126 Wn.2d at 381. For a taxpayer to avoid summary judgment on a theory of flawed methodology, it must demonstrate a genuine issue of fact as to the validity of the assessor's technique applying the clear, cogent, and convincing standard—but it must still demonstrate a genuine issue of material fact as to the correctness of the assessor's value, by a preponderance of evidence.

¶18  Tiger Oil's overarching contention, that the extent of contamination on its properties is unknown and unknowable, is its most striking problem in arguing that summary judgment was improper. If a taxpayer is unable to demonstrate a genuine issue of material fact as to the correctness of the assessor's *value*—even if by only a preponderance of the evidence—then we need not reach whether the methodology was flawed; summary judgment may rest on the presumed correctness of the assessor's value in the absence of prima facie evidence to overcome it. *See Alaska Land Co. v. King County*, 77 Wn.2d 247, 248-49, 461 P.2d 339 (1969). We reject Tiger Oil's argument that, as a taxpayer, it "does not bear the burden of proof to establish the existence of contamination. That burden, at the outset,

is on the Assessor"—in other words, in the event of contamination whose extent and cost of cleanup the County has not undertaken to measure and deduct, then the County loses. Appellant's Reply Br. at 10. To the contrary, the statutory presumption reflects a balance struck between the reasonable responsibility of the assessor and the challenging taxpayer for producing evidence, the purpose of the presumption being "to clarify a taxpayer's burden for challenging a tax assessment." *Weyerhaeuser*, 126 Wn.2d at 379.

¶19 Nonetheless, while Tiger Oil generally argues the impossibility of measuring the cost to cure, it also opposed summary judgment by submitting Mr. Vining's effort to do so, and it urges his measure of value as creating a genuine issue of material fact. We therefore address Tiger Oil's arguments of flawed methodology.

¶20 Tiger Oil contends that the County failed to place primary reliance for valuation on "sales of the property being appraised or similar properties with respect to sales made within the past five years" as required by RCW 84.40.030(1). It relies on the deposition of Mr. Leadon, the county appraiser who arrived at the assessed values, who testified that under the County's mass appraisal process for assessing properties, "[t]he primary valuation process is the cost approach, supported by market," and elsewhere, "[T]ypically in mass appraisal we use the cost approach, again supported by market sales." CP at 153, p. 18; CP at 154, p. 23. The "market support" or "supporting market sales" to which he alluded were not clarified in the deposition. No record of Mr. Leadon's work was offered as evidence in the trial court.

¶21 But Mr. Vining did not place primary reliance on the sale of similar contaminated properties either, and understandably so. Many courts and commentators have noted the difficulty, if not impossibility, of valuing contaminated property with market evidence. *See, e.g.*, Bill Mundy, *Valuing Brownfields, in* BROWNFIELDS: A COMPREHENSIVE GUIDE TO REDEVELOPING CONTAMINATED PROPERTY ch. 6, at 89-90 (Todd S. Davis ed., 2d ed. 2002) (describing the two sales comparison techniques as (1) identifying similar contaminated proper-

ties and (2) identifying the price differential for properties that sold as contaminated and later sold as clean, and noting that "[b]ecause transaction evidence is so 'thin,' it is often difficult to use the sales-comparison approach properly"); *cf. Silver Creek Drain Dist. v. Extrusions Div., Inc.*, 245 Mich. App. 556, 630 N.W.2d 347, 354 (2001) (commenting that contaminated properties are "like snowflakes; no two are alike," in eminent domain context), *aff'd in part, rev'd in part on other grounds*, 468 Mich. 367, 663 N.W.2d 436 (2003), *cert. denied*, 540 U.S. 1107 (2004); *Hous. Auth. v. Suydam Investors, LLC*, 177 N.J. 2, 826 A.2d 673, 687 (2003) (also an eminent domain case, citing The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* Advisory Opinion AO-9 (1997 ed.) for the proposition that use of comparables is highly limited because each environmental problem is as unique as a fingerprint). Without information about the contamination on the subject properties, it would be impossible to do a competent comparable sales analysis; The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* Advisory Opinion AO-9 (rev. 2002), identifies 10 relevant contaminated property characteristics as minimal data to be collected for any comparable sale used in preparing a market analysis; examples include the status of the property with respect to regulatory compliance, remediation lifecycle stage, contamination constituents, cost and timing of remediation plans, liabilities and potential liabilities, and potential limitations on use. Accordingly, rather than use a comparable sales approach, Mr. Vining followed the approach approved by the Board of Tax Appeals in *Moreland* and later approved in *Weyerhaeuser* (unimpaired value, less cost to cure including opportunity cost, less stigma).[2]

¶22 Where there are insufficient sales of similar properties, the cost approach becomes the dominant factor. RCW 84.40.030(2). The assessor is afforded considerable discretion in selecting the method of appraisal, including the use

---

[2] Mundy characterizes this as a cost approach. Mundy, *supra*, at 89.

of market-based mass appraisal cost, which is widely used by assessors and is regarded by the Board of Tax Appeals as valid. *See, e.g., Tyson v. Portmann*, Nos. 08-118 and 08-119, 2010 WL 816166, at *11 (Wash. Bd. of Tax Appeals Feb. 9, 2010). The County's use of the cost approach was not improper.

¶23 As to Tiger Oil's argument that the County used an improper methodology by failing to adjust the properties' values for contamination, the record establishes that the County would have adjusted property values for detrimental conditions if a cost to cure estimate was available. Mr. Leadon testified to that effect. CP at 152, p. 15. He testified that he was unaware, beginning in 2001, of any restrictions, encumbrances, issues, reservations, or covenants on the Tiger Oil properties. CP at 156, p. 33; CP at 157, p. 34. Depositions of Mr. Leadon and Mr. Abbott, the section manager of the toxic cleanup program for DOE's central regional office headquartered in Yakima, established that by June 2007 Mr. Leadon had become aware of alleged contamination and on June 15, 2007 received the following information in an e-mail from Mr. Abbott:

> We have an old estimate of $500,000 for the cleanup of the 24th and Nob Hill property. We do not have estimates for the other sites. I would estimate all of the properties could be cleaned up for approximately $1,000,000 to $1,500,000. This is not a firm estimate[;] it is based strictly on my limited knowledge of the sites. A complete characterization of the North 1st street site, the east Nob Hill site and the 56th and Summitview site would have to be conducted to get a more accurate dollar cost. Of the sites the 56th and Summitview site appears at first blush to be the least contaminated.

CP at 327. However, Mr. Abbott explained in deposition that the $500,000 estimate, which was not his own, dated back to a time prior to the consent decree, when DOE thought it might have to do the cleanup itself. CP at 330, pp. 26-27. He testified that the $1 million to $1.5 million estimate for cleaning up all of the properties was "a guess right off the top of my head." CP at 330, p. 28.

¶24 We agree with the County that this is not truly an argument about improper or competing methodologies. Mr. Leadon's testimony and the County's argument below both grant that environmental contamination is a physical and environmental influence requiring consideration under RCW 84.40.030. Both take the position that the properties' values would have been adjusted for any information meeting the substantive standard adopted in *Weyerhaeuser*. Their position is that no such information exists. This is not a methodology dispute. The parties' dispute is only whether information existed on the valuation dates that was legally sufficient to require consideration by the County and, if believed by the trier of fact, to support a reduction. Since this is the issue raised by Tiger Oil's second and third assignments of error, we turn to those.

II. APPLICATION OF *WEYERHAEUSER*

¶25 In *Weyerhaeuser*, the Washington Supreme Court approved of and adopted a three-part standard developed by the Board of Tax Appeals (Board) for determining whether expenditures on pollution control qualify as a deduction from a property's value. Tiger Oil's refund claim was dismissed on the basis of this standard. It argues that *Weyerhaeuser*'s standard is functionally distinct from the issue raised by its refund claim and should not have been applied.

¶26 *Weyerhaeuser* involved a property tax valuation dispute over a pulp mill. The Board had allowed Weyerhaeuser to reduce the taxable value of its plant for the projected cost of removing asbestos and PCBs (polychlorinated biphenyls) from the mill but not the projected cost of installing pollution control equipment, based on a Board distinction between pollution control expenditures that add value to property ("curable obsolescence," which the Board did not allow as a deduction from value), and expenditures that add no value ("incurable obsolescence," which the Board did allow taxpayers to deduct). Weyerhaeuser argued that "[n]o relevant reason . . . exists to distinguish between them," and

the Washington Supreme Court agreed. *Weyerhaeuser,* 126 Wn.2d at 383.

¶27 In reaching the issue, the court reviewed the basis on which taxable values are adjusted for pollution control, and considered the methods and standards in use by the Board, which it characterized as having done "excellent work" and written "a number of thorough, well-reasoned decisions on the valuation of pollution control facilities." *Id.* at 385 n.4. Discussing the task of valuing contaminated property, the court stated:

> The market value of a plant in compliance with environmental regulations is greater than an identical plant not in compliance. This difference in value measures a form of obsolescence — a noncomplying plant is obsolete compared to an otherwise identical counterpart.

*Id.* at 384 (quoting with approval the International Association of Assessing Officers (IAAO), *Standard on the Valuation of Property Affected by Environmental Contamination* 6.2.1 (1992), and noting that the Board had adopted the same IAAO standard in *Moreland,* 1993 WL 115858, at *4, 1993 Wash. Tax LEXIS 150, at *11). In *Moreland,* the Board—consistent with the IAAO standard—approved the following methodology for determining the fair value of contaminated property: (1) discount the future value of the property in a clean condition to a present value and (2) subtract the discounted value of the remaining likely future cleanup cost. It characterized this approach as "follow[ing] historical appraisal techniques." 1993 WL 115858, at *4, 1993 Wash. Tax LEXIS 150, at *11.

¶28 The *Weyerhaeuser* court endorsed this approach and then turned to the standard by which the Board determined whether a taxpayer had demonstrated a "value of the remaining likely future cleanup cost" sufficiently reliable to support a deduction from value. In a series of cases preceding the Board's decision on Weyerhaeuser's appeal, it had developed the following standard: "[T]he property owner must make a threshold showing of: (1) the existence of . . .

contamination, (2) the existence of a requirement for cleanup, and (3) a reasonably certain estimate of the costs of cleanup, including a formal plan and timetable." *Weyerhaeuser Co. v. Easter*, Nos. 90-17 through 90-24, 1992 WL 289456, at *15, 1992 Wash. Tax LEXIS 732, at *44 (Wash. Bd. of Tax Appeals Sept. 18, 1992) [hereinafter *Weyerhaeuser (BTA)*] (Conclusion of Law 10); *and see Lake Union Drydock Co. v. Ridder*, No. 37655, at 13 n.8, 1990 Wash. Tax LEXIS 451, at *24 n.8 (Wash. Bd. of Tax Appeals Dec. 11, 1990) (Coyle, Vice Chair, concurring); *Lake Union Drydock Co. v. Brooks*, Nos. 41616 and 42733, at 4, 1993 Wash. Tax LEXIS 270, at *3 (Wash. Bd. of Tax Appeals Apr. 9, 1993); *Marco Seattle v. Noble*, No. 40998, at 5, 1993 Wash. Tax LEXIS 931, at *11 (Wash. Bd. of Tax Appeals Oct. 13, 1993). In *Weyerhaeuser*, the court held, "We agree with the Board that a taxpayer must make this showing before claiming pollution control expenses as a deduction from value." 126 Wn.2d at 385.

¶29 Nonetheless, Tiger Oil argues that *Weyerhaeuser* is distinguishable, and the three-part standard cannot be applied to its refund claim, because *Weyerhaeuser* applies only to costs for "pollution control," not contamination remediation. We disagree. The opinion in *Weyerhaeuser* treats "pollution control" as encompassing contamination cleanup, and there is no meaningful difference. Contamination is cleaned up for one reason: to prevent its further dissemination and resulting harm. What is this, if not pollution control? The taxpayer, Weyerhaeuser, treated environmental cleanup as "pollution control" in framing the issue for appeal: its complaint was that no relevant reason existed to distinguish between its expenditures on pollution control equipment and its costs of removing asbestos and PCBs. *Id.* at 383. The court agreed. *Weyerhaeuser*'s threshold test speaks of "the existence of contamination" and a requirement for "cleanup" along with the need for an estimate of costs, a formal plan, and a timetable within which to "accomplish cleanup." *Id.* at 385. These are contamination remediation terms. The Board decision under

review had evaluated Weyerhaeuser's asbestos and PCB cleanup plans for compliance under its three-part "pollution control" standard before allowing them as deductions. *Weyerhaeuser (BTA)*, 1992 WL 289456, at *12-13, 1992 Wash. Tax LEXIS 732, at *35-39 (Findings of Fact 25-29).

¶30 Yet Tiger Oil argues that *Weyerhaeuser's* limitation to "pollution control" was later specifically recognized by the Board in *Swan Bay Holdings, Inc. v. Gelman*, No. 47419, 1997 WL 235942, 1997 Wash. Tax LEXIS 170 (Wash. Bd. of Tax Appeals Feb. 7, 1997), relying on the fact that the decision in *Swan Bay* uses the term "pollution control." Appellant's Br. at 30. Tiger Oil's error is, again, in failing to recognize that the Board regards environmental cleanup as pollution control. *Swan Bay* did not involve pollution control *equipment*; it involved a request to reduce property value by the estimated cost of removing asbestos. Before and after the Supreme Court's decision in *Weyerhaeuser*, the Board has consistently applied the three-part standard as a condition for reducing property value for contamination, including petroleum-contaminated properties with leaking underground storage tanks. *See, e.g., Marco Seattle*, No. 40998, 1993 Wash. Tax LEXIS 931 (contamination); *Brooks*, Nos. 41616 and 42733, 1993 Wash. Tax LEXIS 270 (heavy metals contamination); *Bartow v. Noble*, No. 54222, 2000 WL 242742, 2000 Wash. Tax LEXIS 3 (Wash. Bd. of Tax Appeals Jan. 27, 2000) (petroleum contamination from USTs); *Wertz v. Gassaway*, Nos. 56470 and 56471, 2002 WL 1012824, 2002 Wash. Tax LEXIS 128 (Wash. Bd. of Tax Appeals Apr. 22, 2002) (petroleum contamination at service station property); *Tang v. Noble*, No. 65923, 2008 WL 624764 (Wash. Bd. of Tax Appeals Feb. 1, 2008) (petroleum contamination from USTs); *Lakeside Indus. v. Noble*, No. 67954, 2009 WL 979783, 2009 Wash. Tax LEXIS 208 (Wash. Bd. of Tax Appeals Mar. 2, 2009) (petroleum contamination).

¶31 Tiger Oil additionally contends that whatever the scope of the three-part *Weyerhaeuser* standard, it is not the exclusive basis for demonstrating reduced property value attributable to contamination and—so long as it is not

seeking an adjustment based on future cleanup cost—it can present other evidence of diminished value: in its case, the declarations that the unknown nature, extent, and potential financial risk and burden of any contamination render its properties unsalable and worthless. It argues:

> Tiger Oil does not request a deduction based upon the cost of clean up or its expenses to date, but rather on the basis that the condition of the properties impair their respective values. The existence of environmental contamination alone is sufficient to establish that a property is entitled to a reduced valuation.

Appellant's Br. at 23. It encourages us to look back two decades, to cases that predated, and therefore did not mention, the three-part test, including the Board's decisions in *Northwest Cooperage Co. v. Ridder*, Nos. 36278-36280, 1990 Wash. Tax LEXIS 208 (Wash. Bd. of Tax Appeals July 12, 1990); *Wyckoff Co. v. Belas*, No. 39107, 1991 Wash. Tax LEXIS 668 (Wash. Bd. of Tax Appeals Oct. 17, 1991); and *Moreland*, 1993 WL 115858, 1993 Wash. Tax LEXIS 150. As pointed out by the County, even pre-*Weyerhaeuser*, the taxpayers in those cases could show specific evidence of the total cost of pollution control operations, *Wyckoff*, No. 39107, at 5, 1991 Wash. Tax LEXIS 668, at *7, or provide estimates from expert witnesses on the cost of cleanup. *Nw. Cooperage*, Nos. 36278-36280, at 9, 1990 Wash. Tax LEXIS 208, at *17-19; *cf. Ridder*, No. 37655, at 7, 1990 Wash. Tax LEXIS 451, at *14 (rejecting evidence similar to the evidence in this case as insufficient). More importantly, those early decisions recognized that the task of valuing property subject to regulatory cleanup was new, evolving, and becoming better defined. To the extent that earlier cases discussed the showing required of a taxpayer in different terms, their approaches are supplanted by the three-part standard embraced in *Weyerhaeuser*.[3]

---

[3] The IAAO's *Standard on the Valuation of Properties Affected by Environmental Contamination* (2001) cites *Weyerhaeuser* as a decision that seeks to balance the policy, valuation, and assessment issues raised where the effect of lowering

III. Sufficiency of the Evidence

¶32 Finally, Tiger Oil argues that its evidence submitted in opposition to summary judgment raises a genuine issue of material fact. Because the summary judgment did not present a bona fide issue of methodology, the issue for the trial court was whether Tiger Oil presented evidence from which a rational trier of fact could find it "highly probable" that the county valuation required correction. In determining whether the county valuation required correction, the only relevant evidence of diminished value on account of pollution control or contamination to be considered, and that the County was obliged to consider, would be evidence legally sufficient under the three-part *Weyerhaeuser* standard.

¶33 Tiger Oil's evidence showed the following: Mr. Galloway, the hydrologist engaged as Tiger Oil's environmental consultant, testified that it was impossible to make a determination as to the extent of the contamination on the property and to determine liability or the cost of cleanup. CP at 30. Tiger Oil's president, Mr. Conley, had no knowledge of the extent of gasoline contamination at any of the properties, a timetable for cleanup, or the cost to cure the alleged contamination. He testified, "It is impossible to predict the amount of contamination" and that his consultants attempted to research the amount of gasoline contamination but that the "consultants won't guess. They won't even attempt to guess on it." CP at 114. Tiger Oil responded to the County's requests that it admit that "none of the materials produced by you in response to [discovery] contain a reasonably certain dollar estimate of costs of completing cleanup of hazardous material contamination for [the four parcels]" by answering, "Any basis for any estimate would be pure speculation on behalf of Tiger Oil

property value for the owner of contaminated property is to shift taxes to other, arguably more environmentally sound properties. Whether our Supreme Court would agree with this description of its undertaking, it unquestionably intended to adopt a mandatory standard for addressing the difficult issue of adjusting value, standard it believed had been carefully arrived at by the Board.

Corporation." CP at 301-02, 312. In response to requests that it admit "none of the materials produced by you . . . contain a timetable for completing cleanup of hazardous material contamination for your property," Tiger Oil answered, "The existence of litigation with the Dept. of Ecology has prevented preparation of a timetable. At this stage, preparation of a timetable would be speculative." CP at 303-04, 314.

¶34 Mr. Vining's declaration and appraisal expressed his opinion that each of the properties had a substantial negative value. But the negative values were arrived at by substantially reducing unimpaired land values to present value based on a seven-year time line that was speculation; subtracting costs associated with cleanup and delay that were speculation; and attributing no value to all improvements in place, a principal reason for which was that they might be subject to demolition should soil underneath the buildings contain contaminants—again, speculation. When deposed, Mr. Vining admitted that he had no knowledge of the amount of contamination, a timetable for completing remediation, or the costs of cleanup. CP at 286, 289. He claimed no scientific or engineering understanding of any remediation need. CP at 285. Among the assumptions and limiting conditions to his appraisal report was:

> Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the subject property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of potentially hazardous materials may affect the value of the property. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover such conditions.

CP at 44.

¶35 The only estimate of remediation cost relied upon by Mr. Vining was Mr. Abbott's report of a $500,000 estimate for West Nob prepared in-house by DOE. But the estimate was outdated and notably pre-consent-decree—in other

words, before UST removal and the $3.4 million reported to have been expended by Tiger Oil and its insurer. Without knowing what the $500,000 estimate represented and whether those costs had already been addressed by the $3.4 million spent, the figure was meaningless.

¶36 Mr. Vining's only evidence for an adjustment arguably not encompassed in the *Weyerhaeuser* standard was his reduction of the properties' values by 15 percent of the unimpaired value of the properties for stigma. "Environmental stigma" is "[a]n adverse effect on property value produced by the market's perception of increased environmental risk due to contamination," distinguished from remediation cost, and which "must be based on market data, rather than unsupported opinion or judgment." THE APPRAISAL FOUND., *supra*, AO-9 (2002). Where agreed to by an assessor or supported by evidence, it has been recognized by the Board as a legitimate adjustment to value. Mr. Vining's 15 percent adjustment was based solely on a comparison of prices offered or paid for three convenience stores in Yakima: one was uncontaminated and sold for $820,000, and two others attracted offers of $700,000 each, subject to promised cleanup, but with no sale consummated. CP at 66. Virtually no information on relevant characteristics of the three properties was provided. Conclusory opinions lacking adequate factual support are insufficient to defeat a motion for summary judgment. CR 56(e); *Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 25, 851 P.2d 689, *review denied*, 122 Wn.2d 1010 (1993). Even if considered, the adjustment for stigma would not create an issue of material fact. Mr. Vining's opinion as to the value of the land as unimpaired was significantly higher than the County's land values in every case. For instance, his land value for the West Nob parcel was $181,827, as compared to the County's land value for West Nob of $124,850 for 2003 and $123,250 in 2004. Even reducing Mr. Vining's unimpaired land values for the 15 percent discount he deems appropriate for stigma, his land values for each parcel would still exceed the County's values, and the County's values for the land would stand.

¶37 Tiger Oil's evidence is too speculative and legally insufficient to have warranted consideration by the County or to create an issue of fact as to the correctness of the values assessed in 2003 and 2004.

IV. ATTORNEY FEES

¶38 Tiger Oil requested an award of costs and attorney fees under RAP 18.1 and RCW 84.68.030. Because it is not the prevailing party, there is no basis for an award.

¶39 Affirmed.

KULIK, C.J., and BROWN, J., concur.