# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| REC SOLAR GRADE SILICON, LLC, | No. 52975-1-II |
| Petitioner, | |
| v. | |
| MELISSA McKNIGHT, Grant County Assessor, | UNPUBLISHED OPINION |
| Respondent. | |

SUTTON, A.C.J. — This appeal arises from the property tax valuation of a manufacturing facility owned by REC Solar Grade Silicon, LLC (REC). The superior court remanded the case back to the Board of Tax Appeals (BTA) after its initial decision. The BTA issued a final decision on remand, which the superior court affirmed. REC appeals.

REC argues that the BTA did not follow the court's remand instructions and erred by (1) rejecting REC's appraisal, and (2) classifying REC's machinery & equipment (M&E) as fixtures and not personal property. We hold that (1) the BTA correctly rejected REC's appraisal, and (2) the BTA correctly classified REC's M&E as fixtures. Consequently, we affirm the superior court's order affirming the BTA's final remand decision.

## FACTS

### I. FACTUAL BACKGROUND

REC's facility located in Moses Lake makes and sells solar-grade polysilicon. REC owns a sister plant in Butte, Montana.

When the Moses Lake facility was first built in 1984, it produced polysilicon using a technology known as the Siemens process. In 2006, REC began constructing a new polysilicon unit based on fluidized-bed reactor (FBR) technology. The FBR unit was more efficient than the Siemens process. However, it yielded a lower percentage of prime-grade material. REC chose to invest in the FBR technology based on a contract with an affiliate, REC Wafer, which promised to pay a high price per kilogram for everything that REC could produce.

Around this time, the polysilicon industry began to experience major distress, with stock prices falling drastically. In mid-2011, REC Wafer narrowed the quality of product it would purchase from REC, and it lowered the price per kilogram that it would pay.

In late summer and early fall of 2011, REC prepared a combined budget for both REC facilities. The budget reflected REC's goals for its prime-grade products for 2012 through 2016. The prices did not reflect REC's actual mixed-grade FBR production. REC's budget projections were intentionally aggressive to drive personnel behaviors and improve performance measures.

By August 2011, however, REC was faced with the following:

- a 90 percent chance of losing the contract with REC Wafer;

- a high probability that external customers would be unable to take all volumes produced by REC Solar;

- a high probability that the average sales prices for prime-grade polysilicon would drop to $30 per kilogram or below;

- a high probability that Chinese protectionism would favor polysilicon producers in China;

- a critical risk of [FBR and new silicone unit] production issues;

- a critical risk of problems related to the financial health of [REC Solar's] customers; and

2

- a critical risk of issues with quality and market acceptance for the FBR products.

Clerk's Papers (CP) at 509 (Finding of Fact (FF) 55).

Soon after REC adopted its budget, polysilicon prices plummeted. Nonetheless, REC was still profitable in 2011, and it was still operating at full capacity as of January 1, 2012. During this time, United States solar panel makers sought tariffs against their Chinese competitors, and rumors began that China planned to respond with its own tariffs.

By January 1, 2012, REC Wafer had renegotiated its contract price, and REC had entered long-term volume agreements with two Chinese companies. As of January 1, REC was working to increase production and focusing on technological development on the FBR process, and no tariffs were imposed by China against REC or its customers.

## II. PROCEDURAL BACKGROUND

In January 2012, REC received notice of the Grant County Assessor's[1] assessment for REC's taxable property during the 2011 assessment year. REC petitioned the Grant County Board of Equalization for review before the BTA on direct appeal.

Before the BTA, both parties presented appraisals on the facility. REC's appraisal was done by Kathy Spletter, Robert Clark, Timothy Landolt, and Larry Mott, all from Stancil & Co. McKnight, current Grant County Assessor, offered an appraisal from Carl Klingeman, appraiser for the Washington State Department of Revenue, and Lisa Brewer, Valuation Specialist for the

---

[1] Melissa McKnight is now the assessor, but in 2012, Laure Grammer was the assessor.

3

Washington State Department of Revenue, as well as two appraisals from Neil J. Beaton, Managing Director at Alvarez and Marsal Valuation Services.

There are three approaches to determine valuation: the income approach, the cost approach, and the sales comparison approach. The appraisers all agreed the sales comparison approach did not apply. Under the income approach, appraisers value a business based on the estimated future earnings, and then subtract the value of exempt property and property not under appeal. The cost approach represents the cost to reproduce or replace the property minus physical depreciation and obsolescence affecting the facility. The biggest difference among the appraisers' cost approaches is external obsolescence, which is the loss in value due to external circumstances. Here, McKnight's appraisal recognized no external obsolescence, but Stancil's appraisal quantified external obsolescence.

The BTA rejected all of the appraisals and used its discretion to perform its own valuation, claiming that both parties' income approaches had unreliable estimates for the value of REC. The BTA concluded that the external obsolescence applicable to REC on January 1, 2012, was 35 percent, and the total market value of the subject property was $950,000,000; after subtracting the value of the tangible personal property, the resulting market value was $904,065,000. The BTA also concluded that REC's M&E were classified as real property rather than personal property.

REC filed a petition for judicial review in the superior court under the Administrative Procedures Act (APA).[2] The superior court reversed the BTA, ruling that the BTA erred by:

> 1. Applying an improper test to determine the admissibility of evidence of events occurring after the assessment date. This is an error under RCW 34.05.570(3)(d).

_____

[2] Ch. 34.05 RCW.

4

2. Rejecting the income and cost approaches performed by [REC] appraisal experts because of their limited reliance on the revenue forecast in [REC's] October, 2011, budget. This is an error under RCW 34.05.570(3)(e) because it is based on Findings 53, 70, and 95, which are unsupported by substantial evidence when the evidence in the record is considered as a whole and when Findings 49 and 50, which were unchallenged and are now verities, are considered. It is also an error under RCW 34.05.570(3)(c) because the [BTA] failed to explain the basis for rejecting the [REC's] approaches in light of its Findings 49 and 50 (finding that the [REC's] budgets are intentionally aggressive and that market conditions shifted in late 2011).

3. Failing to follow the procedure as required by RCW 34.05.461(3), which requires the [BTA] to explain how the evidence in the record supports the conclusion that [REC's] machinery and equipment are fixtures. This is an error under RCW 34.05.570(3)(c).

CP at 247-248.

The superior court remanded the case to the BTA with the following instructions:

1. Apply the correct test for admissibility of evidence of events occurring after the assessment date as described in Conclusion 6 (*i.e.*, that evidence about later events may be considered if they confirm trends that a buyer or seller would reasonably consider on the assessment date); explain its application by first describing the evidence known by a buyer or seller as of January 1, 2012, and second, the evidence from after that date whether or not it came before or after July 2012; and consider the evidence in evaluating anew [REC's] appraisal assuming it finds that the events could reasonably have been expected.

2. Identify how market circumstances changed after [REC's] October, 2011, revenue forecast was prepared; then redetermine whether [REC's] appraisal experts were justified in placing only limited weight [10%] on that budget; and, if the [BTA] finds that the taxpayer's revenue forecast should have received more than 10 percent weight, explain how much weight would have been appropriate, particularly in light of Findings 49 and 50, which recognize that market conditions changed by the end of 2011 and that [REC's] revenue forecast was intentionally aggressive to drive personnel and performance; reexamine the income and cost approaches of [REC's] appraisal experts with due consideration in light of this reevaluation of the evidence; use the external obsolescence calculated by [REC's] appraisal experts if the evidence in the record supports it as valid; and reconsider Conclusions of Law 10 through 13 accordingly.

3. Review the record and provide detailed findings explaining the basis for characterizing [REC's] machinery and equipment as real or personal property based on the factors in Conclusion 18.

CP at 248-49. Neither party appealed the remand order.

On remand, the BTA again used its own appraisal, concluding that the total valuable of REC's tangible real and personal property was $820,000,000. After subtracting the tangible personal property value, the BTA determined that the total market value of the real property was $774,000,000. It also concluded, as it did in its initial final decision, that the 18,000 M&E items at issue were real property rather than personal property.

REC again petitioned the superior court for APA review, and the court affirmed the BTA's final decision on remand. REC appeals.

ANALYSIS

I. LEGAL PRINCIPLES

A. TAX VALUATION

Annually as of January 1, the county assessor determines the value of all locally assessed taxable real property in the county. RCW 84.40.020. The assessed value becomes the basis for the taxes that are payable the following year. The market value of the property is the value for tax purposes. RCW 84.40.030(1); *see Welch Foods, Inc. v. Benton County*, 136 Wn. App. 314, 325-26, 148 P.3d 1092 (2006). "[M]arket value is what a willing buyer under no obligation to buy would pay a willing seller under no obligation to sell." *Wash. Beef, Inc. v. Yakima County*, 143 Wn. App. 165, 172, 177 P.3d 162 (2008). We presume the assessor's valuation is correct unless the party appealing presents "clear, cogent and convincing evidence" to the contrary. RCW 84.40.0301.

> "[A] taxpayer who challenges a property valuation for tax purposes must show by clear, cogent and convincing evidence that: (1) there has been an overvaluation; and (2) the overvaluation was either (a) grossly inequitable and palpably excessive or (b) made on a fundamentally wrong basis."

*Weyerhaeuser Co. v. Easter*, 126 Wn.2d 370, 380, 894 P.2d 1290 (1995) (quoting *Nw. Nat. Gas Co. v. Clark County*, 98 Wn.2d 739, 744, 658 P.2d 669 (1983)).

B. APPEAL OF THE BTA'S DECISION

A taxpayer dissatisfied with an assessor's valuation may appeal the assessed value to the county board of equalization. RCW 84.40.038; RCW 84.48.065; WAC 458-14-056. If dissatisfied with the result of the appeal to the county board, the taxpayer may appeal to the BTA. RCW 82.03.130(2). A losing party in a formal hearing before the BTA may petition under the APA for judicial review to the superior court. RCW 34.05.534. The appeal is based on the record made at the BTA hearing. RCW 82.03.180. Unchallenged findings are verities on appeal. *Crystal Mountain, Inc. v. Dep't of Revenue*, 173 Wn. App. 925, 931, 295 P.3d 1216 (2013).

We review the BTA's final decision applying the facts to the law de novo under the APA. RCW 82.03.180. We grant relief under RCW 34.05.570(3) if:

> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;
>
> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

7

(f) The agency has not decided all issues requiring resolution by the agency;

. . . .

(i) The order is arbitrary or capricious.

We review question of law de novo. *Estate of Ackerley v. Dep't of Revenue*, 187 Wn.2d 906, 909, 389 P.3d 583 (2017). We review challenges to the findings to determine whether substantial evidence exists, defined as "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)). We review a decision challenged as arbitrary and capricious to determine if it disregarded the facts and circumstances, was unreasoned and without consideration. *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 609, 903 P.2d 433 (1995). We do not reweigh evidence or judge witness credibility, but instead defer to the agency's broad discretion in weighing the evidence. *PacifiCorp v. Utilities and Transp. Comm'n*, 194 Wn. App. 571, 588-89, 376 P.3d 389 (2016).

## II. THE SUPERIOR COURT'S REMAND ORDER

REC argues that on remand, the BTA ignored the superior court's instructions and violated RCW 34.05.570(3)(c)-(f) and (i). We disagree and hold that the BTA properly followed the superior court's remand instructions.

## A. FIRST REMAND INSTRUCTION

The court's first remand order instructed the BTA to:

1. Apply the correct test for admissibility of evidence of events occurring after the assessment date as described in Conclusion 6 (*i.e.*, that evidence about later events may be considered if they confirm trends that a buyer or seller would reasonably

consider on the assessment date); explain its application by first describing the evidence known by a buyer or seller as of January 1, 2012, and second, the evidence from after that date whether or not it came before or after July, 2012; and consider the evidence in evaluating anew [REC's] appraisal assuming it finds that the events could reasonably have been expected.

CP at 248. The BTA's conclusion of law 6 in the initial final decision, which the court referenced, stated,

6. As a matter of appraisal practice, evidence about events that occur after the assessment date may be considered in developing a retrospective value; events occurring after the assessment date may confirm trends that a buyer would reasonably consider on the assessment date.

CP at 30 (footnote omitted).

The BTA then amended its finding of fact 60 to add a citation to the Uniform Standard of Professional Appraisal Practice (USPAP) and added additional findings of fact 60.1-60.3, to describe the USPAP's Statement on Appraisal Standards No. 3.

Finding of fact 60.2 stated,

[d]ata subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date. . . . In the absence of evidence in the market that data subsequent to the effective date were consistent with and confirmed market expectations as the effective date, the effective date should be used as the cut-off date for data considered by the appraiser.

CP at 510-11.

The BTA also included in its findings a detailed timeline of events from 2006 through 2012 in the polysilicon industry to explain the market changes since REC's budget was prepared. The BTA's additional findings explain that from 2006 to 2011, the worldwide supply of polysilicon increased 37 percent annually. In that same time, the worldwide demand only increased 25 percent annually. "The polysilicon industry graduated from a severe undersupply in 2006 to 2008 to an

extreme oversupply situation, with 32 percent excess capacity in 2011 and an estimated 46 percent excess capacity in 2012." CP at 504 (FF 30) (footnote omitted). Due to oversupply in 2010, prices for polysilicon began to significantly drop. The BTA's findings detailed the problems REC faced given the global polysilicon industry. The BTA ultimately determined that despite hardships, REC was profitable in 2011 and operating at full capacity as of January 1, 2012. And the BTA added that as of January 1, 2012, REC offered no evidence that it made an impairment write-down to establish impairments to its assets.

The BTA then determined that evidence after the January 1 valuation, establishing that a tariff was placed on Chinese manufacturers and that the prices of polysilicon continued to drop, was inconsistent with the pre-valuation date evidence. The BTA determined that market events occurring after the assessment date were likely unknowable as of January 1, 2012not be used by a prospective buyer on that date. Thus, the BTA did not use post-valuation date evidence when determining REC's market value. *See Wash. Beef*, 143 Wn. App. at 172.

On remand, the BTA applied the correct test for admissibility of evidence after the January 1, 2012, assessment date, explained its application to the evidence, and found that the events after January 1 could not have been reasonably considered by a prospective buyer. Thus, we hold that the BTA properly exercised its discretion and complied with the remand instructions order as to this issue.

B. SECOND REMAND INSTRUCTION

The court also instructed the BTA on remand to (1) identify market changes after the October 2011 budget, and determine what weight the budget should have been afforded, (2) reexamine Stancil's income and cost approaches in light of reevaluating evidence of the market

changes, (3) if Stancil's approach was valid, use its external obsolescence calculation, and (4) reconsider its conclusions regarding the BTA's valuation.

1. Identify how Market Circumstances Changed after REC's October, 2011 Revenue Forecast

First, the court ordered the BTA to consider the changes in the market after REC's October 2011 revenue forecast. On remand, the BTA added finding of fact 58: "[f]rom the time REC Solar's budget forecast was developed in early fall 2011, the market price for prime grade silicon dropped approximately 50 percent by 2011 year end." CP at 509 (FF 58) (footnote omitted). This additional finding is based on the unchallenged findings regarding the changes in the polysilicon industry and REC's business after its October 2011 budget and revenue forecast were prepared. .

2. Re-determine Whether REC's Appraisal Expert Was Justified in Placing only Limited Weight on the October 2011 Budget

Second, the court ordered the BTA to re-determine whether REC's appraisal expert, Stancil, was justified in placing only limited weight on REC's October 2011 budget. The BTA found that REC successfully met its annual budget projections for production volume every year. The BTA's findings explained the significant discrepancies regarding Stancil's and REC's revenue forecasts and production forecasts, and the impact of these differences as used in Stancil's appraisal.

Stancil's revenue forecast in its appraisal underestimates the projected levels of production and product prices. The BTA noted that Stancil's appraisal was inconsistent with REC's 2011 annual report, which stated that, "[v]olumes included in the impairment analysis are near full production capacities. Production volumes are expected to increase," and which stated that prices would "pick up year-by-year in subsequent years." Administrative Record (AR) Ex. R22-88.

**3. If the Board Finds that REC's Revenue Forecast Should have Received more than 10 Percent Weight, Explain how much Weight would have been Appropriate, Particularly in Light of Findings 49 and 50**

Third, the court ordered the BTA to determine whether REC's October 2011 revenue forecast should have been given more than 10 percent weight, and if so, to determine what weight was appropriate based on findings 49 and 50. Findings of fact 49 and 50, which are unchallenged, stated:

> 49. In late summer through early fall of 2011, REC Solar produced a five-year budget for 2012 through 2016, covering both the Moses Lake and Butte facilities. The purpose of the budget is to set goals for the Taxpayer's production volume and quality. Intended to drive personnel behaviors and performance measures, the budgets are aggressive . . . .
>
> . . . .
>
> 50. The 2012 budget includes a risk matrix that reflects the significant risks perceived as of August 2011. Had the risk analysis been performed at the end of 2011, rather than in August 2011, a number of the risks would have increased in probability. The risk matrix shows a number of subjective vulnerabilities applicable to REC Solar's ability to achieve the budget . . .

CP at 17-18 (FF 49, 50).

The BTA ultimately determined that Stancil's income approach methods and calculations were flawed because it used methodologies "of significant controversy" within the appraisal community and under the USPAP's appraisal standards cited in the additional BTA findings 60.1-60.3. CP at 520 (FF 101.1). Therefore, the BTA properly exercised its discretion and did not accord any weight to Stancil's revenue forecast in its initial decision or on remand. And the BTA concluded that the cost approaches by Stancil and McKnight produced close results prior to economic obsolescence, so the BTA correctly used both approaches prior to considering economic obsolescence.

4. Re-examine the Income and Cost Approaches of REC's Appraisal Based on Re-evaluation of the Evidence

Fourth, the court ordered the BTA to re-examine the income and cost approaches of Stancil's appraisal based on its re-evaluation of the evidence. On remand, the BTA determined that "[n]o evidentiary weight is accorded to the value determined by the Stancil appraisal's [discounted cash flow] DCF analysis," listing its reasons. CP at 514 (FF 76).

The reasons are the following: (1) the significant difference between the Stancil appraisal's revenue forecast and the revenue forecast in the REC budget; (2) the declines in revenue forecast and production forecast in the Stancil appraisals, as well as the flat production forecast; (3) the underestimated projected levels of production and product prices; (4) the low weight it gave to the REC budget; and (5) that Stancil's business enterprise value was near REC's operating profit in the first half of 2011. The BTA reiterated this explanation in finding of fact 101.

5. Use the External Obsolescence Calculated by REC's Appraisal Expert if the Evidence in the Record Supports it as Valid

Fifth, the court ordered the BTA to use Stancil's calculation of external obsolescence if the evidence supported it as valid. Although REC argues to the contrary, the BTA did not ignore Stancil's method for calculating external obsolescence. The BTA noted Stancil's method, but used its discretion to determine that Stancil's method is "a matter of significant controversy within the appraisal community." CP at 520 (FF 101.1). Based on the evidence that Stancil's method was not valid, the BTA was not required to use Stancil's external obsolescence calculation, and the BTA did not err.

Accordingly, we hold that the BTA properly followed the superior court's remand instructions.

### III. CHARACTERIZATION OF M&E AS REAL PROPERTY OR FIXTURES

REC also argues that the BTA misapplied controlling law by classifying REC's M&E as fixtures. We hold that the BTA properly classified REC's M&E as fixtures, and thus, the BTA did not err.

Determining whether an article is a fixture is a mixed question of law and fact. *Dep't of Revenue v. Boeing Co.*, 85 Wn.2d 663, 667, 538 P.2d 505 (1975). "It is well recognized that determining what constitutes a fixture as opposed to personal property is a difficult task, that depends on the particular facts of each case." *Union Elevator & Warehouse Co., Inc. v. Dep't of Transp.*, 144 Wn. App. 593, 603, 183 P.3d 1097 (2008). "The term 'real property' for the purposes of taxation shall be held and construed to mean and include the land itself . . . and all buildings, structures or improvements or other fixtures of whatsoever kind thereon." RCW 84.04.090.

Under the common law test for fixtures, applicable here, an item of personal property becomes a fixture or real property if three elements are met:

> "(1) Actual annexation to the realty, or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; and (3) the intention of the party making the annexation to make a permanent accession to the freehold.'"

*Boeing*, 85 Wn.2d at 667 (quoting *Lipsett Steel Prods,, Inc. v. King County*, 67 Wn.2d 650, 652, 409 P.2d 475 (1965)). All three elements must be established before an article may be deemed to be a fixture. *Boeing*, 82 Wn.2d at 668. Thus, if any of these elements is absent, proof of a fixture is lacking.

Intent is the most important element of the fixtures test. *Union Elevator*, 144 Wn. App. at 603. Evidence of intent is gathered from the circumstances at the time of installation. *Boeing*, 85 Wn.2d at 668.

> [A]ll pertinent factors reasonably bearing on the intent of the annexor should be considered in assessing the intent at the time of annexation including, but not being limited to, the nature of the article affixed, the relation and situation to the freehold of the annexor, the manner of annexation, and the purpose for which the annexation is made.

*Boeing*, 85 Wn.2d at 668. Here, because REC does not challenge any of the findings of fact on this issue, the findings are verities. *Crystal Mountain*, 173 Wn. App. at 931.

The court's remand order instructed the BTA to "[r]eview the record and provide detailed findings explaining the basis for characterizing [REC's] [M&E] as real or personal property on the factors in Conclusion 18." CP at 249. Exercising its discretion, the BTA concluded that REC's M&E were fixtures. The BTA concluded that REC failed to meet its burden to prove that the three above criteria were not met. REC cites a number of cases[3] to support its argument that M&E is personal property, but none of those decisions apply here. And this is a fact-specific issue based on the record, which we review de novo. *See Union*, 144 Wn. App. at 603. As explained below, the BTA made extensive findings of fact supporting its conclusion that REC's M&E are fixtures.

First, the BTA concluded that REC's argument—that the 18,000 items of M&E may be removed without damaging the underlying buildings or land based on general testimony about certain items of M&E—was not supported by the evidence in the record. The BTA also concluded

---

[3] *See Zimmermann v. Bosse*, 60 Wash. 556, 111 P. 796 (1910); *see also Neufelder v. Third St. & Suburban Ry.*, 23 Wash. 470, 63 P. 197 (1900); *Chase v. Tacoma Box Co.*, 11 Wash. 377, 39 P. 639 (1895); *Wash. Nat'l Bank v. Smith*, 15 Wash. 160, 45 P. 736 (1896); *Cherry v. Arthur*, 5 Wash. 787, 32 P. 744 (1893); *Union Elevator*, 144 Wn. App. 593.

that REC assumed that an item of M&E can only be a fixture if it is physically attached in such a way that its removal will damage the underling real property, but that was not supported by the record. Instead, the BTA concluded that REC owns the M&E, and the M&E is securely attached to the real property or has been constructively annexed as required by the first element. While particular items on the property may be moved or replaced, the manufacturing process halts when any of the M&E is moved.

Second, the BTA found that the M&E was used for the purpose of which the property was designed as required by the second element. The M&E was specifically designed for the process REC used in that specially designed FBR building, and nobody else in the polysilicon industry uses such M&E.

Third, the BTA found that REC intended for the M&E to be permanently used on the property as required by the third element, and REC did not provide any evidence to the contrary. When the BTA provided REC with a template of an extensive asset list of 18,000 items for review, REC responded with an unrelated concern regarding a software issue. The same M&E now at issue was on Grant County's real property tax rolls for assessments in 2010 and 2011; REC made no objections to the M&E being included as real property at that time. REC also argues that the M&E could have been moved, that the M&E has a shorter life span than the buildings, and that some of the M&E has been replaced or reconfigured. These arguments are unpersuasive.

In sum, the M&E were actually annexed to or something appurtenant to the property, the M&E were used and for the purpose of integrating with the property and associated buildings, and REC intended for the M&E to be part of the property, and made no objection earlier to their

inclusion. Because REC has failed to meet its burden, we hold that the BTA did not err by classifying the M&E as fixtures or real property.

## CONCLUSION

We affirm the superior court's order affirming the BTA's final decision on remand.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Sutton, A.C.J._
Sutton, A.C.J.

We concur:

_Worswick, J._
Worswick, J.

_Melnick, J._
Melnick, J.